**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

_____

JENNFER J. TAYLOR                               )
                                                )
    Plaintiff,                          )
                                                )
      v.                          )    CA No. 1:12cv523
                                                )    (GBL/IDD)
REPUBLIC SERVICES, INC., *et al.*               )
                                                )
    Defendants.                         )
_____)

# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Elaine Charlson Bredehoft, VSB No. 23766
ecb@cbcblaw.com
Carla D. Brown, VSB No. 44803
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN
  BROWN & SAKATA, P.C.
11260 Roger Bacon Drive, Ste. 201
Reston, Virginia 20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile

*Counsel for Plaintiff, Jennifer J. Taylor*

# **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ........................................................................1

STATEMENT OF MATERIAL FACTS GENIUNELY IN DISPUTE....................................1

Prior To Ms. Taylor's Interaction with Jason Callaway,
She Was Well-Regarded ........................................................................1

Mr. Callaway Visits Ms. Taylor's Home in the Middle the Night .................................2

As the Only Female Director in the East Region, Ms. Taylor
is Targeted For Intense, and Unjustified Scrutiny .............................................3

The 2009 Investigation of Jason Callaway's Visit ............................................5

Jason Callaway is Disciplined and Told to Remove Himself
From Ms. Taylor ...............................................................................7

Republic's Response To the Complaint is Ineffective –
Mr. Callaway and Others Continue to Involve Mr. Callaway
In All Matters Pertaining to Ms. Taylor.......................................................9

Ms. Taylor Performs Well and Receives Raises and Bonus .........................................10

Mr. Rains Becomes Ms. Taylor's Supervisor, is Advised of an
Issue with Jason Callaway, and Continues to Keep Mr. Callaway
in the Loop Regarding Ms. Taylor..............................................................10

Mr. Krall and Mr. Callaway Run the Synergy Bonus Process –
and Deny Ms. Taylor a Synergy Bonus .........................................................11

Ms. Taylor is Not Allowed to Travel to Do Her Job –
and Questioned Even When She Does ............................................................13

Ms. Taylor Is Friendly with Mr. Perkins Until He Graphically Tells Her
That He Wants to Have Sex with Her – Republic Never Even Investigates........................14

Republic Attempts to Creates False Performance Issues .......................................15

Ms. Taylor is Sent Home, Placed on Indefinite Leave, and Terminated
For Complaining about Her Treatment – Which Republic Refuses to
Even Investigate ...............................................................................15

Once Ms. Taylor Leaves Republic, The Company Targets Her
Husband  To Force Him to Make Her Settle Her Claims.....................................................19

ARGUMENT ...........................................................................................................................20

I.    Ms. Taylor's Retaliation Claim Should be Decided at Trial ....................................20

    A.  Mr. Callaway and Mr. Rains Made the Decision to Deny
Ms. Taylor a Synergy Bonus – Which Would Not have Been
Fully Decided or Paid Until 2012 ...............................................................................20

    B.  Keith Cordesman's Reference to Ms. Taylor as "Fucking Bitch" – and
Republic's Refusal to Even Investigate this Claim – Contributed to the
Hostile Work Environment To Which Ms. Taylor was Subjected ..............................22

    C.  Ms. Rains Email in August 2011 was Retaliatory and He Was
Well-Aware of the Situation Between Mr. Callaway and Ms. Taylor..........................23

    D.  Republic's Attempts to Falsely Blame Ms. Taylor for Problems
Encountered with a Vendor are Further Examples of the Hostile
Work Environment She Suffered at Republic ..............................................................24

    E.  Ms. Taylor Associational Retaliation Claim Raises a Triable Issue of Fact ............24

        1.    A Reasonable Employee Would be Dissuaded from Complaining
if they Knew Their Spouse Would Become a Target of the Retaliation ..........24

        2.    Ms. Taylor Exhausted Her Administrative Remedies Regarding
Her Claim of Retaliation Against her Husband .................................................25

II.    Ms. Taylor Has Circumstantial Evidence of Discrimination....................................29

CONCLUSION ......................................................................................................................30

## TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby,* Inc., 477 U.S. 242 (1986) ...........................................................20

*Burlington v. Ellerth*, 524 U.S. 742 (1998)..........................................................................21

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ..........................................24

*Chisholm v. United States Postal Serv*., 665 F.2d 482 (4th Cir. 1981)..................................25

*Darveau v. Detecon Indus.,* 515 F.3d 334 (4th Cir. 2008) ...................................................25

*Dolgaleva v. Va. Beach City Public Schs*., 364 Fed. Appx. 820 (4th Cir. 2010) .................26

*EEOC v. GE*, 532 F.2d 359 (4th Cir. 1976)..........................................................................25

*Hill v. Lockheed Martin Logistics Management, Inc*., 354 F.3d 277 (4th Cir. 2004)............30

*North American Stainless v. Thompson*, 131 S. Ct. 863 (2011) ............................................24, 25

*Richmond, Fredericksburg & Potomac Railroad Co. v. U.S., et al*.,
  945 F.2d 765 (4th Cir. 1991) ............................................................................................26

*Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000) ............................................25

*Taylor v. CNA Corp.,* 782 F. Supp. 2d 182 (E.D. Va. 2010, Ellis, J.) ..................................28, 29

## SUMMARY OF ARGUMENT

Partial summary judgment is not appropriate in this action as to any of Ms. Taylor's claims. Ms. Taylor is entitled to the opportunity to air the substantial evidence, much of which is laid out in these pleadings, to a jury of her peers (or to this Court should it so decide).

Jennifer Taylor was subjected to years of discrimination, sexual harassment, and to a hostile work environment, including the Head of Human Resources showing up at her home unannounced at 11:30 p.m. and then having other members of Republic's join with him to punish her for refusing to submit to his desires. Ms. Taylor complained to multiple members of Republic's management regarding her treatment at Republic, which, in turn, lead her to being targeted for further harassment and discrimination. Once Ms. Taylor left Republic, the Company targeted her through her husband, who worked closely with Republic as a vendor.

Ms. Taylor has presented a triable issue on her retaliation claims that she, as the only female Director in the East Region office, was treated differently than males with whom she worked.

In responding to Defendants' Motion for Partial Summary Judgment, Ms. Taylor has responded only to those items raised by the Defendants in this brief.[1] As to those items, Defendants' Motion for Partial Summary Judgment warrants denial.

## STATEMENT OF MATERIAL FACTS GENIUNELY IN DISPUTE

**Prior To Ms. Taylor's Interaction with Jason Callaway, She was Well-Regarded**

---

[1] Contrary to Defendants' claim that Plaintiff "has agreed to proceed against Republic Services of Virginia, LLC alone, and not Republic Services, Inc." no such agreement has been reached. Plaintiff, through counsel, agrees to discuss this option provided an appropriate Stipulation is entered into addressing Plaintiff's concerns.

1.      At the time Ms. Taylor was being considered to join Republic, she had been with Allied Waste for a year in the position of Director of Infrastructure Development, and was assessed by her Manager as an employee with "high potential" for success.  Callaway Dep, Att. 1at 227:22 - 228: 15.

**Mr. Callaway Visits Ms. Taylor's Home in the Middle the Night**

2.      In 2008, Ms. Taylor attended a work related event with a number of her colleagues at Allied Waste.  Taylor Dep., Att. 2 - 187:15-189:3.  During the evening, Ms. Taylor engaged in a conversation with Mr. Callaway, then VP of HR for Ms. Taylor's Region, and Dick Hutchinson and his wife regarding the neighborhood where the Hutchinsons and Ms. Taylor then lived as Mr. Callaway was relocating and considering the area.  Taylor Dep., Att. 2 at 190:9 - 191:18; 195:13 - 197:15.

3.      At the end of evening, Ms. Taylor offered to take Mr. Callaway, and another Vice President, Christopher Hill to their hotel, which was not out of the way and was en route to her home. Taylor Dep., Att. 2 at191:19- 195:9.

4.      During the car ride, Ms. Taylor and Mr. Callaway continued to discuss the neighborhood and the school system, as well as repairs being made on Ms. Taylor's home.   Att. 2 at 194:11 – 195:22.  When Mr. Callaway asked if he could come by to see the home and repairs, Mr. Taylor told him yes, anytime, and, "Call me next time you are in town."  Taylor Dep., Att. 2 at 194:11 – 195:12.

5.      Ms. Taylor did not intend to have Mr. Callaway come to her home that evening, as it already 11:30 p.m.. Att. 2 at 199:20 - 200:4.  She did not give Mr. Callaway a ride to her home that evening and he did not travel with her to her home.  Taylor Dep., Att. 2- 202:13-21.

6.      Ms. Taylor was shocked when Mr. Callaway arrived at her home fifteen minutes later -- shortly before mid-night. Taylor Dep., Att. 2 at 205:17 – 206:3.  Ms. Taylor asked Mr. Callaway what he was doing at her home and told him that it was an inappropriate time.  Att. 2 at 220:11 – 221:8.  Mr. Callaway responded that since he was there, he wanted to see her renovations. Taylor Dep., Att. 2 at 220:20 – 221:8.[2]

7.      Mr. Taylor relented and gave Mr. Callaway a brief tour of the first level of her home. Taylor Dep., Att. 2 at 222:18 – 224:8.

8.      When Mr. Callaway invited himself to see Ms. Taylor's upstairs level, she understood that he was propositioning her to have sex with him (both by his demeanor and by his words), and told him that he had to leave.  Att. 2 at 254:7-19; 257: 16-19.

9.      Within weeks of Mr. Callaway's impromptu visit, Ms. Taylor reported it to Health Eddleblute, her then Manager.  Taylor Dep., Att. 2 at 42: 9- 44:13.  Mr. Eddleblute did nothing to investigate Ms. Taylor's report and responded laughing, saying "Little man [Mr. Callaway] is trying to get some action."   Taylor Dep., Att. 2 at 42: 9- 44:13.

10.      Shortly after this incident, in May 2009, Mr. Callaway was relocated to the same office as Ms. Taylor in Centreville, Virginia, and served as the Vice President of Human Resources for her region, and Ms. Taylor.  Callaway Dep., Att. 1 at 182:21- 183:1; 46:6-18.

**As the Only Female Director in the East Region, Ms. Taylor is Targeted
For Intense, and Unjustified Scrutiny**

---

[2]  Despite Defendants' attempts to criticize Ms. Taylor for allowing Mr. Callaway access to her home, he was a Vice President in a position of authority over her – in fact, shortly after her inaction with him at her home, he advocated that her pay be decreased as part of her joining Republic.  *See* Email from J. Callaway to R. Krall of 10/29/08, Att. 3 (Pl.'s Exh. 8).

11.      When Ms. Taylor started working in the East Region office, post-merger, she was

the only female Director and was subjected to intense scrutiny.  Murphy Dep., Att. 4 at 219:5-11

(Ms. Taylor was the only female Director).

12.      Prior to paying Ms. Taylor's work related cell phone bills, Mr. Murphy required her

to provide him with a copy of her "detailed" phone statements.  *See* Email from J.  Taylor to D.

Murphy of 2/26/11, Att. 5 (Pl.'s Ex. 24).

13.      Despite her being an executive of the Company, Mr. Murphy closely scrutinized her

whereabouts.  *See* Email from D. Murphy to J. Callaway of 5/29/09, Att. 6 (Pl.'s Ex. 34)("She never

returned to the office);

14.      Mr. Krall, Mr. Murphy, and Mr. Callaway targeted Ms. Taylor, assuming without

speaking to her, that she was lying about her whereabouts.  *See* Email from R. Krall to D. Murphy

and J. Callaway of 5/27/09, Att. 7 (Pl.'s Ex. 36)("What happened … PIP or term…?")[3]  They also

falsely accused her of being at the gym in the middle of the day.  *See* Email from R. Krall to D.

Murphy and J. Callaway of 5/29/09, Att.  9.[4]

15.      In June 2009, Mr. Murphy attempted to place Ms. Taylor on a Performance

Improvement Plan ("PIP").  *See* PIP, Att. 11.

16.      Contrary to Defendants' claim that Ms. Taylor had performance issues leading to the

PIP, none of the alleged bases for the PIP was substantiated.  Ultimately, Ms. Taylor refuted the

---

[3]  Interestingly, when Mr. Krall demoted Mr. Murphy the following year, he neither placed him
on a PIP nor  terminated him.  Krall, Att. 8 at 162:12 - 163:14; 174:16-17.

[4]  Despite the fact that Ms. Taylor often worked late and through lunch, Mr. Murphy also
required Ms. Taylor to report to him if she was going to be even a few minutes late in the
morning.  *See* Email from J. Taylor to D. Murphy of 12/4/09, Att. 10 (Pl.'s Exh. 82); Email of
1/8/10, Att. 10 (Pl.'s Exh. 96).

allegations in the PIP, and after Ms. Taylor spoke to Mr. Callaway providing examples of falsities in the PIP, he intervened and did not give her the PIP.  *See* J. Callaway's Notes, Att. 12 at 2, 4 (handwritten notes in margin); *see also* Callaway Dep., Att. 1 at 148:1 – 149:18.

17.     Notably, the only other person who Mr. Callaway had placed on a PIP was another woman (with Ron Krall), one who had complained that women at Republic are treated like "slaves." Callaway Dep., Att. 1at 132:20 – 133:8; 111:20 – 112:1; 114: 17 – 115:1.

18.     When Mr. Callaway returned the PIP to Ms. Taylor, he told her that she could "rip it up."  Taylor Dep., Att. 2 at 271:12 – 272:10.

19.     Afterwards, apparently in exchange for his involvement, Mr. Callaway suggested to Ms. Taylor that they go down the hall and have sex in an empty office.  Taylor Dep., Att. 2 at 178:13 – 180:11.

20.     Throughout this time, Mr. Callaway continued his advances, which Ms. Taylor rebuffed and tried to manage only by involving him in interactions involving others in the office. Taylor Dep., Att. 2 at 178:13 – 180:11.

**The 2009 Investigation of Jason Callaway's Visit**

21.     On October 31, 2009, Ms. Taylor's boxing gym was hosting a Halloween party for its members.  Ms. Taylor and Jodi Boyce ("Ms. Boyce"), an HR Manager, who also attended the gym and worked in Ms. Taylor's office, agreed to have dinner at Jackson's in Reston, then continue to the holiday event.  The two were acquaintances through work, not friends, and Ms. Taylor was aware at the time that Ms. Boyce worked in HR and reported directly to Jason Callaway.

22.     Ms. Taylor then advised Ms. Boyce what had occurred with Mr. Callaway when he visited her home.  Ms. Boyce, then an HR Manager, responded to Ms. Taylor's statements, without

even investigating Ms. Taylor's allegations, by reaching a conclusion that Ms. Taylor was "setting

up the Company" because she allegedly said she had saved relevant documents.  Boyce Dep., Att.

13 at 70:11 – 71:4.   Notably, Ms. Boyce never even asked to see a copy of the alleged documents.

Boyce Dep., Att. 13 at 51:3-8.

23.     Ms. Boyce refused to even call the concerns Ms. Taylor had raised to her a

complaint.  Att. 13 at 52:9 – 53:9.   Ms. Boyce claimed she was concerned about the possibility that

Ms. Taylor had documents, but not about the subject matter of Ms. Taylor's reported interaction

with Mr. Callaway.  Boyce Dep., Att. 13 at 57:9-18.

24.     Ms. Boyce then reported to Mr. Callaway everything that Ms. Taylor had told her,

and gave Mr. Callaway the option to self report to Mr. Krall.  *See* Email from J. Boyce to R. Krall

and Statement of J. Boyce, Att. 13A at 3.[5]

25.     Republic then conducted an investigation of the concerns raised by Ms. Taylor.

Ellingsen Dep., Att. 14 at 102.

26.     During the investigation, Ms. Taylor shared her concerns regarding the treatment she

was receiving from Mr. Murphy and what had occurred with Mr. Callaway.  Ms. Taylor never

denied that Mr. Callaway had come to her home and nothing Defendants cite for such proposition

supports their claim.

27.     The immediate response of Mr. Callaway, who was the then the Head of Human

Resources in the Region, was to attempt to portray Ms. Taylor as promiscuous and lacking good

character, claiming that "HINDSIGHT – NOW KNOWING HER BACKGROUND AND M.O. –

VISIT WAS A BIG MISTAKE" and that "If intend to Discipline [me] – will request that every

region office ee [employee] to be interviewed so you can understand her character and intentions

---

[5] Ms. Boyce was subsequently promoted.  Callaway, Att. 1 at 231:19 – 232:1.

(Jeans make ass look, Swallerin and hollerin, request to go partying, Affairs, etc.)" *See* Notes of

Jason Callaway, DEF7968-69, Att. 12 ¶ 2(b)(3) and p. 2.

28.     Mr. Callaway admitted in his deposition, that his reference to Ms. Taylor having

"affairs" was reference to an alleged rumor that he had heard and that he had never spoken to

anyone about whether the items he was referring to were even true. Callaway, Att. 1 at 181:11 –

184:9, 194:11-20.

29.     Mr. Callaway further admitted that he did not know anything negative that any

employee in the region office would have said about Ms. Taylor.  Callaway, Att. 1 at 201:1 – 204:4.

He admitted that, despite his alleged claim that Ms. Taylor made a comment about her "ass," he, as

VP of HR never spoke to her about or asked anyone in HR speak to her about the alleged.

Callaway, Att. 1 at 211:2-20.[6]

**Jason Callaway is Disciplined and Told to Remove Himself From Ms. Taylor**

30.     Despite Republic's claim that it was unable to determine what happened at Ms.

Taylor's home that evening, Mr. Callaway admitted that he had gone to Ms. Taylor's home in the

middle the night.

31.     Republic disciplined Mr. Callaway for exercising poor judgment:

Although not all allegations raised were substantiated, certain conduct by you was
established (through your own admissions and the statements of others) to have
occurred.  While such conduct did not violate any Company policy explicitly, it did
demonstrate a serious lapse of professional judgment on your part.

*See* Memo. from R. Krall to J. Callaway, Att. 8B (Pl.'s Ex. 89).

32.     Ms. Taylor was never disciplined. *See* Ellingsen Dep., Att. 14 at 248:19-22.

---

[6]  In addition to Ms. Taylor adamantly denying making such a statement, she was in counseling
for body image issues during this time.  Lilenfield Dep., Att. 15 at 17:14 – 18:11.

33.     In addition to Mr. Callaway's attempts to smear Ms. Taylor's character after learning of her complaint, Republic's then Deputy General Counsel, Vice President, Catherine Ellingsen, made clear that her concern was protecting the company, as she stated, "I think we need the communication drafted this way to adequately protect the Company."  Email from C. Ellingsen to R. Krall, et al. of 12/3/09, Att. 14B (Pl.'s Ex. 79).

34.     In fact, the reprimand that Ms. Ellingsen drafted, and that Mr. Krall provided to Mr. Callaway, attempted to imply that more than one employee had engaged in inappropriate behavior despite the fact that the only person who was reprimanded was Mr. Callaway:

> As you know, it has come to the Company's attention that certain employees may have engaged in inappropriate workplace conduct.

*See* Memo from R. Krall to J. Callaway, Att. 8B (Pl.'s Ex. 89).

35.     Mr. Callaway testified that Ms. Ellingsen told him that he was no longer to be in charge of making "employment related" decisions regarding Ms. Taylor.  Ms. Ellingsen testified that she then told Ms. Taylor and Mr. Callaway that Mr. Callaway would no longer serve in a HR function to Ms. Taylor.

36.     In fact Ms. Ellingsen testified that in the two year period that she was allegedly serving in an HR capacity to Ms. Taylor, she did not speak to her a single time.   Ellingsen Dep., Att. 14 at 311:3-18.

37.     Mr. Callaway claims that in December 2009 he told Mr. Krall hat he was not to be involved in employment related decisions pertaining to Ms. Taylor.  Callaway Dep., Att. 1 at 130: 6-9.

**Republic's Response to the Complaint is Ineffective – Mr. Callaway and Others Continue to Involve Mr. Callaway in All Matters Pertaining to Ms. Taylor**

38.     Contrary to Republic's claim that Mr. Callaway did not engage in any alleged sexual harassment after August 2009, as a result of Ms. Taylor's refusal to submit to his sexual advances he engaged in a campaign of making her working conditions impossible.

39.     Republic's claimed attempt to remedy the situation was ineffective as, emails produced by Defendants throughout Ms. Taylor's employment demonstrate that Mr. Callaway continued to involve himself in setting her annual goals, be involved in her employment-related decisions, and, in essence remain in a supervisory position over her, for example:

- January 13, 2010 – Mr. Callaway was involved in discussions regarding calculating Ms. Taylor's vacation time.  Email between J. Callaway to J. Boyce of 1/13/10, Att. 16 (Pl.'s Ex. 98);

- January 15, 2010 – Mr. Callaway advised Ms. Taylor regard her equity interests.  Email between J. Callaway, J. Boyce, and J. Taylor of 1/15/10, Att. 17 (Pl.'s Ex. 100);

- In fact, in March 2010, Mr. Callaway provided Ms. Taylor's 2010 Management Incentive Plan ("MIP") to Ms. Taylor's then supervisor, Mr. Murphy, telling Mr. Murphy to "Please let me know if you have any questions."  Email between J. Callaway, R. Krall, and D. Murphy of 3/15/10, Att. 18 (Pl.'s Ex. 110);

- Mr. Callaway emailed with Ronald Krall, the very person he claimed he told that he was not to be involved in HR matters pertaining to Ms. Taylor -  *See* Email from J. Callaway to R. Krall of 4/15/10, Att. 19 ( Pl.'s Ex.  118); Email from R. Krall to J. Callaway of 8/10/10, Att. 20 (Pl.'s Ex. 49); and Email from J. Callaway to R. Krall of 8/10/10, Att.  21 (Pl.'s 150).

40.     However, Republic's inability and refusal to effectively address the situation sent a clear message to Ms. Taylor that Human Resources would not do anything to protect her.

**Ms. Taylor Performs Well and Receives Raises and Bonus**

41.     Ms. Taylor performed her job duties well in 2009 and, in 2010, she received a merit pay increase, bonus, and a stock option award in the amount of $13,768.  *See* J. Taylor's 2010 Annual Compensation Statement, Att. 22.

**Mr. Rains Becomes Ms. Taylor's Supervisor, is Advised of an Issue with Jason Callaway, and Continues to Keep Mr. Callaway in the Loop Regarding Ms. Taylor**

42.     In the Summer of 2010, Mr. Murphy was demoted, and Mr. Rains became Ms. Taylor's supervisor.  Rains Dep., Att. 23 at 19:3-16 and 107:2-22 – 108:1.

43.     Although Defendants claim Mr. Rains was completely unaware of the 2009 and investigation of Mr. Callaway's conduct, Ms. Ellingsen admitted that she told Mr. Rains, that for Ms. Taylor, Mr. Callaway was not to serve in an HR role to her.  Ellingsen, Att. 14 at 241:8 – 243:9.

44.     Mr. Callaway told Mr. Krall that he was not to be involved in employment related decisions regarding Ms. Taylor.  Att. 1 at 129:16 – 130:4.

45.     Yet, both Mr. Rains and Mr. Krall continued to correspond with and copy Mr. Callaway on communications relating to Ms. Taylor, especially criticisms of her performance.  *See* Email from C. Rains to C. Ellingsen, R. Krall, and J. Callaway of 8/25/11, Att. 24 (Pl's Ex. 201); Emails between C. Rains and J. Callaway of 8/9/10, Att. 25 (Pl.'s Ex. 146); Email from R. Krall to J. Callaway and C. Rains of 8/10/10, Att. 26 (Pl.'s Ex. 149)(complaining about Ms. Taylor's performance and questioning Ms. Taylor's whereabouts); *see also* Email from J. Callaway to C. Rains and R. Krall of 8/10/10, Att. 27 (claiming Ms. Taylor's travel for interviewing was unnecessary).

46.     It is no surprise that others in the region attempted to blame Ms. Taylor for performance issues that where not hers.  For example, when Mr. Rains suggested that a change be implemented in the field reporting structure, Ms. Taylor immediately contacted Drew Isenhour, an

Area President, and Shawn Brady, to discuss how the suggested change would work.   Isenhour

Dep., Att. 28 at 16:2-10.   Both responded to her that the suggested change would not be a good idea

and would not add value to the Company.   Isenhour Dep., Att. 28 at 16:15 – 17:7.   Yet, when Ms.

Taylor provided the information to Mr. Rains, he suggested she did not understand the role of the

individuals at the organization.   *See* Defs.' Ex. 26.

47.     With respect to Recycle Bank, Ms. Taylor did not negotiate the contract with the

vendor.   Gorske Dep., Att. 29 at 74:9-12.   Many of the Directors at Republic complained about

Recycle Bank and tried to work through a resolution with the entity.   Gorske Dep., Att. 29 at 74: 13

– 75:8.   Mr. Perkins viewed RecycleBank as dishonest.   Perkins Dep., Att. 30 at 60:19 – 62:18.   Mr.

Perkins spoke to Ms. Taylor regarding tightening up the language in the Republic-RecycleBank

contract, and then approached Mr. Jameson who was receptive to the suggestions.   Perkins Dep.,

Att. 30 at 64:16-20; 65:9-18.

48.     Yet, when Ms. Taylor voiced a concern regarding RecycleBank, Mr. Jameson

responded suggesting that she was somehow responsible for the problems with RecycleBank.   *See*

Email from D. Jameson to J. Taylor of 8/3/11, Defs.' Ex. 27.

**Mr. Krall and Mr. Callaway Run the Synergy Bonus Process –**
**and Deny Ms. Taylor a Synergy Bonus**

49.     In the first quarter of 2012, Republic paid its employees synergy bonuses.   Krall

Dep., Att. 8 at 61:6-10.

50.     Mr. Krall made recommendations regarding who should receive a synergy bonus

and the amount.   *See* Email from J. Young to R. Krall and J. Callaway of 3/16/09, Att.  31 (Pl.'s Ex.

25)("The approved way amounts are based on the recommendations you provided."); *see also*

Email from J. Hughes to R. Krall of 1/13/12, Att. 32(Pl.'s Ex. 230)("There were approved positions

at the time of creation of the synergy plan, at a fixed bonus amount. *There was also discretion given to the region SVP [Mr. Krall] to identify positions and dollar amounts to include in the plan based on their estimated relative contribution to synergy capture.*") (Emphasis added).

51.     In addition, Mr. Callaway managed the "whole" synergy bonus process.  Callaway Dep., Att. 1 at 242:10-22.

52.     In fact, the Director of Municipal Services was listed on Republic's Master Synergy Bonus Pool Spreadsheet, but never assigned an amount.  *See* Synergy Bonus Pool, Att. 33 (Pl.'s Ex. 156)

53.     Virtually every employee in the East Region who supervised Ms. Taylor received a synergy bonus.  *See* Synergy Bonus Pool, Att. 33 at 1. (Pl.'s Ex. 156).

54.     Mr.  Rains testified that he received a synergy bonus in 2012 for his work in 2011. Rains Dep., Att. 23 at 28:5-8.

55.     Even Mr. Murphy, who had been demoted from his position in 2010 and replaced by Mr. Rains at the time the bonuses were paid, received a synergy bonus of $200,000.  Murphy Dep., Att. 4 at 62:3-4.

56.     Ms. Taylor's replacement as the Director of Municipal Services, Allen Ruttenburg, received a synergy bonus.  Callaway Dep., Att. 1 at 68:14-16; 71:3-7.

57.     Yet, Ms. Taylor did not receive a bonus. This was particularly unusual given that Ms. Taylor's duties involved multiple synergies, including, managing the sales Municipal sales force in the East Region, which had previously not existed at Republic, including setting a uniform compensation system for the sales team and implementing software tracking sales and contracts. Murphy Dep., Att. 4 at 81:19 – 82:13; 95:11- 103:; *see also* Gorske Dep., Att. 29 at 45:18–47:11.

58.     When Ms. Taylor asked Jodi Boyce whether she would receive a synergy bonus, despite the Synergy Bonus Pool, Mr. Callaway responded that Ms. Taylor's position was not in the Synergy Bonus Program.  *See* Email from J. Callaway to J. Boyce of 4/23/11, Att. 34; *see also* Synergy Bonus Pool, Att. 33 (Pl.'s Ex. 156).   Yet, Mr. Ruttenburg received a synergy bonus while serving in Ms. Taylor's position.

**Ms. Taylor is Not Allowed to Travel to Do Her Job – and Questioned Even When She Does**

59.     While Republic contends that Ms. Taylor maintains that Mr. Krall targeted her by requiring her to use the travel calendar, this statement misses the mark.  In fact, even when Ms. Taylor used the travel calendar, Mr. Krall would contact others in the Company inquiring whether Ms. Taylor's attendance at events added any value.  *See* Email from J. Taylor to C. Ellingsen of 8/12/11, Att. 35 at 2-3 (containing Mr. Krall's emails inquiring regarding Ms. Taylor's whereabouts).

60.     Despite Mr. Krall's refusal to allow Ms. Taylor to travel and his questioning the purpose when she did, Ms. Taylor's supervisors criticized her for not obtaining the "buy-in" of her colleagues in the organizations but, at the same time, refused to allow her to travel to build the necessary relationships.  Taylor Dep., Att. 2 at 160:6 – 163:4.

61.     Johnnie Perkins, Ms. Taylor's counterpart in the West, testified that he observes his subordinates in the field as necessary to provide coaching.  Att. 30 at 53:20 – 54:14.  Daniel Gorske, Ms. Taylor's counterpart in the Midwest Region also testified that he met with his representatives and with customers. Gorske Dep., Att. 29 at 16:15-19; 17:2-3; 43:4-10.

62.     In fact, a review of Ms. Taylor's expense report from her employment shows she traveled extensively in 2008, but traveled significantly less closer to the end of the her employment. *See* Defs.' Ex. 12 ("Expense Report").[7]

63.     In addition, Mr. Krall criticized Ms. Taylor and made condescending comment to her in bid reviews, undermined her authority, laughed at her with other males in the group, and encouraged them to laugh at her.   Taylor Dep., Att. 2 at 467:5 – 468:14.  He also had his assistant take roll on Ms. Taylor, which he did not do to others in the office (mostly males).  *Id.*

**Ms. Taylor Is Friendly with Mr. Perkins Until He Graphically Tells Her**
**That He Wants to Have Sex with Her – Republic Never Even Investigates**

64.     Until the Fall of 2010, Ms. Taylor enjoyed a friendly relationship with Robert Pickens, VP of Special Waste.  Taylor Dep., Att. 2 at 314:4 – 315:13.

65.     In the Fall of 2010, Ms. Taylor attended the Ryder cup, as a vacation with her now husband, Steve Stradtman, and with other Republic individuals who were attending the event as a work function.  Taylor Dep., Att. 2 at 314:4 – 315:13.[8]

66.     At dinner at the event, Mr. Pickens said to Ms. Taylor:

> I would like to spread your legs and eat your pussy all night.  He said to me that, I would like to fuck you all night, I would like to ride you like a wild pony, I would like to lick you all night and make you come all over my face.

Taylor Dep., Att. 2 at 306:15 - 311:7.

---

[7] Notably, the Expense Report contains repeats of several entries, especially from the 2008 time period.

[8]  Contrary to Defendants' claim that Ms. Taylor accepted tickets from Otto, as a vendor of Republic, Ms. Taylor paid for sufficient items to cover the cost of her ticket, and, in any event other Republic employees, including Mr. Pickens accepted Otto paying the full cost of their travel to and attendance at the event.  Taylor Dep., Att. 2 at 381:3-20; 382:22 – 383:10.

67.     Ms. Taylor reported this to Ms. Ellingsen on August 12, 2011, but Ms. Ellingsen never investigated.  Taylor Dep., Att. 2 at 306:15 - 311:7; Ellingsen, Att. 14 at 304:4 – 305:5.

**Republic Attempts to Creates False Performance Issues**

68.     In August 2011, Ms. Taylor attended a WasteCon in Nashville, Tennessee, where she had another home.  She volunteered to help set up for the conference because her counter-part in the area had a new baby and because she did not mind assisting, and left on Friday to do so.   Taylor Dep., Att. 2 at 421:19- 423:19; 411:16 – 412:18.

69.     Ms. Taylor also unpacked boxes, went to multiple stores to purchase candy for give away, and attended a conference sponsored event.  Taylor Dep., Att. 2 at 415:19 – 417:5.

70.     During that same time, Ms. Taylor did not attend a call because she was addressing another customer's issue, and she was aware that the call pertained to a bid the Company had already decided not to pursue.  Att. 2 at 425:12 – 428:11.

71.     Yet, Mr. Rains falsely accused her of not attending the conference earlier and falsely contended that Ms. Taylor had done something inappropriate by not attending the call.

**Ms. Taylor is Sent Home, Placed on Indefinite Leave, and Terminated for Complaining about Her Treatment – Which Republic Refuses to Even Investigate**

72.     On August 11, 2011, Ms. Taylor called Ms. Ellingsen, and followed up with her in email, asking her for help, and noting that she was being subjected to suspected retaliation as a result of her complaint against Jason Callaway and to other conduct that appeared to her be to "retaliatory, discriminatory, or otherwise hostile in nature."  *See* Email between J. Taylor and C. Ellingsen of 8/12/11, Att. 36 (Pl's Ex. 191).   Ms. Taylor told Ms. Ellingsen that she was being treated differently than males.  Ellingsen, Att. 14 at 269:7 – 22.

73.     The two spoke by phone regarding Ms. Taylor's complaints for more than an hour that day.  Taylor Dep., Att. 2 at 430:3 – 434:8.

74.     Ms. Taylor also told Ms. Ellingsen that Keith Cordesman had referred to her as a "fucking bitch" at a recent conference.  Ellingsen, Att. 14 at 262:8 – 264:17; see also Taylor Dep, Att. 2 at 124:10 – 129:3.

75.     Unbelievably, Ms. Ellingsen testified that the items Ms. Taylor had relayed to her on August 12, 2011, were not considered by her to be  "complaint" and that "it was not a complaint to be investigated."  Att. 14 at 304:4 – 305:5.

76.     Ms. Ellingsen never investigated Ms. Taylor's concerns raised to her by email on August 12, 2011, and in their conversation that same day.  Ellingsen, Att. 14 at 277:1 – 280:5.

77.     At the time Ms. Taylor complained about the conduct of Jason Callaway and others Ms. Ellingsen was Mr. Callaway's direct supervisor.  Att. 1 at 11.

78.     Ms. Ellingsen's immediate response was to tell Ms. Taylor that she could leave the Company through an exit package, transfer to another department, or confront the persons about whom she was complaining with her complaints.  Ellingsen Dep., Att. 14 at 282: 3 – 14; 283:5-10; 286:17 – 287:4; 287:22 – 288:8.

79.     Ms. Ellingsen testified that she never offered any options that involved any action taken against the persons about whom Ms. Taylor complained, or their departure from the Company.  Ellingsen Dep., Att. 14 at 287:5-21.

80.     Ms. Taylor was also told that Ms. Ellingsen would explore whether rehabilitating the Region team was option, which she later refused to explore saying she had heard (from the very

people about whom Ms. Taylor complained) that Ms. Taylor had performance issues.  Taylor Dep., Att. 2 at 446:10 − 448:; *see also* Ellingsen Dep., Att. 14 at 302:12-19; 308:1-7.

81.     In fact, Mr. Rains testified that Ms. Ellingsen told him to order Ms. Taylor to leave the office if she attempted to raise any of her complaints with him.  Rains Dep., Att. 23 at 211:14 − 212:20.  During the same time that Mr. Rains was advised to tell Ms. Taylor to leave, he created a fabricated email intended to portray Ms. Taylor as having performance issues.  *See* Email from C. Rains to C. Ellingsen and R. Krall of 8/25/11, Att. 24 (Pl's Ex. 201).

82.     When Ms.  Taylor met with Mr. Rains, she told him had she had recently complained to Ms. Ellingsen regarding her treatment at Republic, and Mr. Krall and Mr. Callaway's retaliation against her.  Rains Dep., Att. 23 at 213:16 − 215:6; Taylor Dep., Att. 2 at 438:18 − 440:2.

83.     He immediately told her to leave the office.  Rains Dep., Att. 23 at 213:16 − 215:6.  Mr. Rains told Ms. Taylor to get her things and go home until he "figured out what to do with [her]."  Taylor Dep., Att. 2 at 438:4-9.

84.     Republic never investigated Ms. Taylor's August 11 and 12, 2011 complaints to Ms. Ellingsen, and never investigated whether the continued claims about her performance were a further product of discrimination, harassment, and retaliation.  Instead, Ms. Ellingsen decided to credit the claims of the individuals about whom Ms. Taylor had complained and to completely discredit Ms. Taylor's claims.

85.     Ms. Taylor immediately reached out to Ms. Ellingsen telling her that she was disappointed that Ms. Ellingsen had never responded after their August 12, 2011 conversation more than two weeks prior, and asking for Ms. Ellingsen's assistance.  *See* Email from J. Taylor to C. Ellingsen of 8/29/11, Att. 37.

86.     When Ms. Taylor asked Mr. Rains and Ms. Ellingsen whether she would be allowed to return to work the following day, she was advised to stay home and not given a specific return date.  *See* Email between J. Taylor, C. Rains, and C. Ellingsen of 8/29/11, Att. 38.

87.     Ms.  Ellingsen told Ms. Taylor, without conducting any investigation of her claims, that, now that she had heard that Ms. Taylor allegedly had performance issues, she would be terminated.  Taylor Dep., Att. 2 at 446:10 – 448:12-14.

88.     Ms. Taylor responded to Ms. Ellingsen telling her that she did not understand why she was being terminated, that she had reviewed the Company's offers to leave, and that she felt she was being further retaliated against.  *See* Email from J. Taylor to C. Ellingsen, 9/8/11, Att. 39.

89.     The following day, Ms. Taylor filed an E.E.O.C. Charge, making clear that she believed she had been discriminated against, subjected to hostile work environment and retaliated against.  *See* E.E.O.C. Charge, Att. 40.

90.     Even then, Ms. Ellingsen refused to reconsider having Ms. Taylor remain at Republic or to conduct an investigation.  *See* Email from Ms. Ellingsen to J. Taylor of 9/13/11, Att. 41 (Pl.'s 221).

91.     According to Ms. Ellingsen, she refused to allow Ms. Taylor to remain because Ms. Ellingsen did not believe it would make sense for Ms. Taylor or for the Company to have Ms. Taylor return to a situation where she was "unhappy."  Ellingsen Dep., Att. 14 at 320:16- 321:12.

92.     Contrary to Republic's claim that Mr. Krall, Mr. Callaway, and Mr. Rains had no involvement in Ms. Taylor's termination, they had supplied the fabricated information that Ms. Taylor had performance issues.

93.     Moreover, it was clearly understood within Republic that Ms. Taylor had been

terminated as Mr. Jameson told James Van Weelden that, "Jennifer Taylor is gone from RSG – she

did not clear waivers!!" – a baseball analogy to not making the cut.  *See* Email from D. Jameson to

J. VanWeelden of 10/6/11, Att. 42 (Pl.'s Ex. 226).

**Once Ms. Taylor Left Republic, The Company Targeted Her Husband**
**To Force Him to Make Her Settle Her Claims**

94.     Jennifer Taylor and Stephen Stradman were married on October 22, 2012.

Stradman Dep. Att. 43 at 37:4-5.

95.     Shortly after Ms. Taylor filed her Amended Complaint, Republic began to target

Otto. Specifically, Republic local managers in Pittsburgh told Otto sales representatives that

while they wanted to continue to use Otto, orders that were destined to Otto were being

overturned at the Regional level and the local mangers were not told why.

96.     In November 2011, Chris Synek, Republic's Executive Vice President, spoke to

Mr. Stradman regarding the two men sitting down to resolve Ms. Taylor's complaint and discuss

a settlement.  *See* Emails between Mr. Synek and Mr. Stradman of 11/29/11, Att.  44 (Pl.'s Ex.

228).  When their discussions failed to settle the matter, Republic intensified the retaliation of

Ms. Taylor through her husband.

97.     Mr. Krall testified that Republic employs a limit of authority policy which

dictates that if a bid is for a certain dollar amount, exceeding the level of authority of the person

below Mr. Krall, the bid must be reviewed by Mr. Krall before approval. Krall Dep. Att.  8 at 90:

22 and 91:1-14.

98.     Mr. Krall testified that at the end of 2011 or in 2012 Republic's procurement

department had contacted him regarding Otto's concerns over canceled orders. Krall Dep. Att. 8

at 33:17-22-34:10. Mr. Krall stated that Tom Piersa questioned Mr. Krall about not ordering

from Otto, and Mr. Krall stated that there were assembly and delivery issues with Otto services

in Pittsburgh that needed to be resolved before orders could resume. Krall Dep. Att. 8 at 35:2-12.

99.     Although stating that the services areas in Pittsburgh were the cause of not

delivering Otto orders, Mr. Krall could not recall whether the Pittsburgh issues arose in 2009,

2010, 2011, or 2012 or whether they were even ongoing at the time he spoke to Mr. Piersa.

Earlier in his testimony Mr. Krall suggested that the Pittsburgh issues arose in either 2009 or

2010. Mr. Krall then contradicted himself and stated that they may have arisen in 2011 or 2012.

Krall Dep. Att. 8 at 35:14-22.

100.     In mid 2011, Mr. Isenhour was instructed by Mr. Yelinek, who reported to Mr.

Krall, to cease purchasing carts from Otto because Republic was experiencing service issue with

Otto. Isenhour Dep. Att. 28 at 19:1-16.

101.     Mr. Isenhour testified that while Republic had experienced service issues with

Otto competitor, Shaffer, no one from Republic ever instructed Republic employees not to order

from Shaffer. Isenhour Dep. Att. 28 at 20:5-10.

## **ARGUMENT**

Summary judgment must be denied when the non-moving party can demonstrate that a

triable issue of fact exists. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## I.     MS. TAYLOR'S RETALIATION CLAIM SHOULD BE DECIDED AT TRIAL

### A.  Mr. Callaway and Mr. Rains Made the Decision to Deny Ms. Taylor a Synergy Bonus – Which Would Not have Been Fully Decided or Paid Until 2012

In essence, Defendants maintain that Ms. Taylor has not alleged a retaliation claim for the

denial of her synergy bonus, because, Defendants contend, Ms. Taylor did not report Mr.

Callaway's visit to her home (and therefore did not engage in protected activity), that the decision to pay the synergy bonus was in 2009, and neither Mr. Callaway nor Mr. Krall were involved in the decision to deny Ms. Taylor's bonus.  A genuine issue of material fact exists as to all of the above issues.

Republic's claim that there was no protected activity lacks merit.  Ms. Taylor reported Mr. Callaway's visit to her home to Jodi Boyce and an investigation ensued.  *See* Email from J. Boyce to R. Krall and Statement of J. Boyce, Att. 13 at 3; *see also* Ellingsen Dep., Att. 14 at 102. Moreover, Mr. Callaway was the Head of HR in Ms. Taylor's Region at the time of his visit to her home and had substantial authority over her.  *See* Callaway Dep., Att. 1 at 182:21- 183:1; 46:6-18. He was not simply a "co-worker," as Defendants contend, and as her supervisor and Vice-President, Defendants are responsible for his conduct.[9]

Moreover, the synergy bonuses were not paid until 2012 and correspondence to Mr. Krall and Mr. Callaway makes clear that the decision as to who would receive bonuses and in what amount was still ongoing and was in the discretion of Mr. Krall.  *See* Krall Dep., Att. 8 at 61:6-10; *see also* Email from J. Hughes to R. Krall of 1/13/12, Att. 32(Pl.'s Ex. 230)("There were approved positions at the time of creation of the synergy plan, at a fixed bonus amount. *There was also discretion given to the region SVP [Mr. Krall] to identify positions and dollar amounts to include in*

---

[9]    In *Burlington v. Ellerth*, 524 U.S. 742, 760-61 (1998), the Supreme recognized that companies are liable for the conduct of their supervisory personnel.

> In *Meritor*, we acknowledged this consensus. See *477 U.S. at 70-71* ("The courts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, or should have known, or approved of the supervisor's actions"). Although few courts have elaborated how agency principles support this rule, we think it reflects a correct application of the aided in the agency relation standard.

*the plan based on their estimated relative contribution to synergy capture*.") (Emphasis added).[10]

In addition, Mr. Rains testified that he received a synergy bonus in 2012 for his work in 2011. Rains Dep., Att. 23 at 28:5-8. Even Mr. Murphy, who had been demoted from his position in 2010 and replaced by Mr. Rains at the time the bonuses were paid, received a synergy bonus of $200,000. Murphy Dep., Att. 4 at 62:3-4. Similarly, Ms. Taylor's replacement as the Director of Municipal Services, Allen Ruttenburg, received a synergy bonus. Att. 1 at 68:14-16; 71:3-7.

Contrary to Defendants' claim that Mr. Callaway had no involvement in any the synergy bonus process, Mr. Callaway testified the exact opposite was true. In fact, Mr. Callaway testified that he managed the "whole" synergy bonus process. Callaway Dep., Att. 1 at 242:10-22.[11]

### B. Keith Cordesman's Reference to Ms. Taylor as "Fucking Bitch" – and Republic's Refusal to Even Investigate this Claim – Contributed to the Hostile Work Environment To Which Ms. Taylor was Subjected

Defendants appear to convolute the significance of Mr. Cordesman's comments. They are part of the hostile work environment to which Ms. Taylor was subjected and are also part of the conduct Ms. Taylor reported that contributed to her retaliatory termination. Mr. Cordesman's is yet another example of the hostile work environment to which Ms. Taylor was subjected, and one Defendants refused to correct.

In fact, Ms. Ellingsen testified that even after hearing that Mr. Cordesman had made the comments, she neither investigated them nor pursed the any outcome pertaining to the comments.

---

[10]   Given that the synergy bonuses were not paid until 2012 and were being discussed throughout her employment, Defendants cannot maintain that Ms. Taylor did not file her September 9, 2011 E.E.O.C. in sufficient time to include the denial of her synergy bonus.

[11]   Defendants' claim that "Callaway and Krall's recommendation to offer Taylor a job in the East-Region in the post-merger Republic is antithetical to her [retaliation] claim" is non-sensical. Under Defendants' theory, any employer who hires a person cannot be liable for retaliation simply because the initial job offer was extended.

Ellingsen, Att. 14 at 262:8 – 264:17; Att. 2 at 124:10 – 129:3; and Att. 14 at 304:4 – 305:5.  Yet,

shortly after Ms. Taylor complained, Republic placed her on indefinite leave and then terminated

her.

### C.  Ms. Rains Email in August 2011 was Retaliatory and He Was Well-Aware of the Situation Between Mr. Callaway and Ms. Taylor

Mr. Rains was aware there was an issue between Jason Callaway and Jennifer Taylor and

that Mr. Callaway was not being involved with her.  Ellingsen Dep., Att. 14 at 241:8 – 243:9.  Yet,

Mr. Rains continued to correspond with and copy Mr. Callaway on correspondence relating to Ms.

Taylor, especially criticisms of her performance.  *See* Email from C. Rains to C. Ellingsen, R. Krall,

and J. Callaway of 8/25/11, Att. 24 (Pl's Ex. 201); Emails between C. Rains and J. Callaway of

8/9/10, Att. 25 (Pl.'s Ex. 146); Email from R. Krall to J. Callaway and C. Rains of 8/10/10, Att. 26

(Pl.'s Ex. 149)(complaining about Ms. Taylor's performance and questioning Ms. Taylor's

whereabouts); *see also* Email from J. Callaway to C. Rains and R. Krall of 8/10/10, Att. 27

(claiming Ms. Taylor's travel for interviewing was unnecessary).

When Mr. Rains suggested that a change be implemented in the field reporting structure,

Ms. Taylor immediately contacted Drew Isenhour, an Area President, and Shawn Brady, to discuss

how the suggested change would work.   Isenhour Dep., Att. 28 at 16:2-10.  Both responded to her

that the suggested change would not be a good idea and would not add value to the Company.

Isenhour Dep., Att. 28 at 16:15 – 17:7. Yet, when Ms. Taylor provided the information to Mr.

Rains, he suggested she did not understand the organization.  *See* Defs.' Ex. 26.

A reasonable finder of fact can conclude that Mr. Rains' animus toward Ms. Taylor was the

product of retaliation against her.

### D.  Republic's Attempts to Falsely Blame Ms. Taylor for Problems Encountered with a Vendor are Further Examples of the Hostile

**Work Environment She Suffered at Republic**

Essentially, when Ms. Taylor's male counterparts raised concerns regarding the project, they were invited to discuss their concerns. Perkins Dep., Att. 30 at 64:Lines 16-20; 65: Lines 9-18.

However, when Ms. Taylor did so, she was criticized and ridiculed. *See* Email from D. Jameson to J. Taylor of 8/3/11, Defs.' Ex. 27.

### E. Ms. Taylor Associational Retaliation Claim Raises a Triable Issue of Fact

#### 1. A Reasonable Employee Would be Dissuaded from Complaining if they Knew Their Spouse Would Become a Target of the Retaliation

In *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)*, the Court held that a Title VII retaliation plaintiff need not allege or prove an ultimate adverse employment action, because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."   Title VII's anti-retaliation provision prohibits a broad range of employer conduct.  *See generally Burlington, 548 U.S. at 53.*  This includes employer action that "well might have "dissuaded a reasonable worker from making or supporting a [discrimination] charge." *Id*. at 68.

In *North American Stainless v. Thompson*, 131 S. Ct. 863, 868; 178 L. Ed. 2d 694 (2011), the Supreme Court affirmed that retaliation against a complainant's fiancé can constitute retaliation, "We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired."

In fact, this Circuit has long recognized that conduct that arises following the separation of employment, and even during litigation, can constitute retaliation.  *See Darveau v. Detecon Indus.*, 515 F.3d 334, 342 (4th Cir. 2008)(holding Defendant's filing a baseless lawsuit against the plaintiff in Fairfax Circuit Court after the plaintiff filed FLSA claims in the Eastern District

constituted retaliation).

Ms. Taylor's husband was the CEO of a Company that served as a preferred vendor to Republic, and such he had an employment relationship almost as close at the plaintiff in *North American* Stainless.  The conduct that Republic directed toward him was intended to punish Ms. Taylor for not settling her claims with the Company after he met with Mr. Synek in December.

### 2.    Ms. Taylor Exhausted Her Administrative Remedies Regarding Her Claim of Retaliation Against Her Husband

A plaintiff bringing discrimination claims under federal statutes is given broad latitude to bring claims based upon the allegations made in her EEOC charge, and is not restricted to the charges stated in his or her EEOC charge of discrimination.  "If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247-248 (4th Cir. 2000) (citing to *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)).  As the Fourth Circuit observed, "[the] purpose of the charge under section 706 is only to initiate the EEOC investigation, to trigger the investigatory and conciliatory procedures of the EEOC.  The charge is not to be treated as a common-law pleading that strictly cabins the investigation that results therefrom, or the reasonable cause determination that may be rested on that investigation." *EEOC v. GE*, 532 F.2d 359, 364 (4th Cir. 1976) (internal quotations omitted).

Defendants cite to no authority to show that Plaintiff's pleading is insufficient to show exhaustion of administrative remedies – and it is reasonably inferred from the pleadings that the covered conduct in E.E.O.C. Charge is the same illegal behaviors giving rise to Ms. Taylor's Title VII claims.  Defendants' attempt to dismiss Ms. Taylor's discrimination and retaliation

claims on this basis ignores the reality that Defendants received proper notice of the charge of, and that the Complaint states claims that are properly contemplated by that charge.  Defendants are unable to demonstrate any prejudice to them.

Moreover, on her E.E.O.C. coversheet, Plaintiff identified her claims as occurring up to the date of her filing and as a "Continuing Violation," indicating the conduct would continue after her filing.  *See* Coversheet of E.E.O.C. filing, Att. 40.  Once the E.E.O.C. (*sua sponte*) dismissed her claims to allow her proceed in Court, she was not required to, and could not, return to the E.E.O.C. to amend claims that were no longer under the E.E.O.C.'s jurisdiction and now belong to the Court.

The question of exhaustion of remedies is a question of subject matter jurisdiction.[12] Once decided, this issue is resolved. This is exactly what the Court did in this matter, by considering the EEOC Charge which was not attached to the Complaint.   Previously, the Defendants explicitly argued that Ms. Taylor failed to exhaust her administrative remedies with respect to the retaliation targeted at her, through her husband and Otto, his former employer:

> THE COURT: And her husband's contract was terminated. I'm not sure how that fits in. But she says that was retaliation, too.
>
> MR. BALDWIN: Yes, sir. Working backwards, **with respect to this contract with Auto [sic – Otto], there's no claim in the case in which she alleges that that is a part of her retaliation claim**. It's simply a factual allegation.  **And if there were, she has failed to exhaust with respect to that claim. It's not contained in her EEOC charge. The**

---

[12]  *See Dolgaleva v. Va. Beach City Public Schs* 364 Fed. Appx. 820,824, 2010 U.S. App. LEXIS 2048, ** 9 (4th Cir. 2010)(recognizing that the failure to exhaust administrative remedies is a question of subject matter jurisdiction); *see also Richmond, Fredericksburg & Potomac Railroad Co. v. U.S., et al.*, 945 F.2d 765, 768 (4th Cir. 1991)("In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment . . . . The district court should apply the standard applicable to a motion for summary judgment. . . .").

> **Court received the voluminous EEOC charge as we did, and there's no indication in that EEOC charge that she's complaining that somehow the company canceled the contract with Auto [sic – Otto] to retaliate against her. . . . Therefore, with respect to her retaliation claim, we submit to the Court that it should be dismissed in toto.**

*See* Trans. of Mot. to Dismiss Hearing of Aug. 17, 2012, Att. 45 at 6:21- 8:14 (Emphasis added).

The Court held Plaintiff had exhausted her administrative remedies as to the allegations

giving rise to those retaliation claims:

> THE COURT: Thank you. Let the record reflect this matter is before the Court on the Defendant's motion to dismiss the amended complaint.
>
> The parties have briefed the matter and I've reviewed the submissions and the amended complaint which is 54 pages and has 285 allegations.
>
> The question presented with respect to Count 1 is whether the plaintiff here in Count 1 and 2 has failed to identify the claims in her EEOC charge and whether or not she has sufficiently pled that she submitted these charges to EEOC.  And I think that the answer to that is that it was properly submitted to EEOC, that the plaintiff has produced, even though it was not attached to the complaint, a copy of the charge. We've reviewed the charge as I said during the colloquy. **I think the charge is more than sufficient to support the exhaustion of the claims administratively.**
>
> **And so as it relates to the motion to dismiss for failure to exhaust administrative claims in Counts 1 and 2, that will be denied.**

Att. 45 at 27:15-28:9 (Emphasis added).   What is equally surprising is that in the subsequent

Motion *in Limine* hearing, Defendants' counsel claimed to the District Judge that they had never

raised this argument:

> THE COURT: I didn't ask you about viable.  I'm saying did it give you notice that the plaintiff was asserting a claim of associational retaliation that her husband's business was cut off because of actions taken from retaliation from her filing her complaint? That was in the complaint, wasn't it? Paragraph 46 and 190. It's in there. Now, you filed a motion to dismiss. Did you ever bring up the issue of paragraphs 46 and 190 not being a viable claim for associational retaliation?
>
> MR. BALDWIN: We did not.

*See* Trans. of Mot. in Limine Hearing of Oct. 19, 2012, Att. 246 at 14:11-21.  To date, Defendants have never attempted to correct this claim before the Court, which is now belied by the Hearing Transcript. Defendants sought no alternative relief to the Court's August 17, 2012 ruling, if they believed there was a basis.

Finally, Defendants' reliance upon Mr. Stradtman's complaint for the position that he voluntarily left his position with Otto lacks legal and factual support.   In *Taylor v. CNA Corp.*, 782 F. Supp. 2d 182 (E.D. Va. 2010, Ellis, J.) – the Honorable Judge Ellis considered when a claimant has been forced to leave his position.  While *Taylor* involved a tortious interference claim, the Court explained:

> It is axiomatic that a plaintiff cannot sustain a claim of tortious interference with business expectancy when he willingly surrendered his right to those expectancies.  **Of course, if conditions at CNA had become so intolerable that [Plaintiff] were effectively left with no practical choice other than quitting, then it would be unfair to characterize his decision as willingly made.**

*Id.* at 204 (Emphasis added).

Ultimately, in *Taylor*, after a review of the evidence and record in the matter, the Court concluded the plaintiff, Mr. Taylor, had not sufficiently established that racial bias was the basis for driving him out of the organization, and, thus, he could not state a claim that his working conditions were intolerable under 42 U.S.C. § 1981 (prohibiting discrimination based on race). *Id.* at 200.  As such, the basis for finding the workplace not "intolerable" is inapplicable here.

However, the plain language of the *Taylor* court's ruling supports that Mr. Stradtman's departure was not willingly made.

As alleged in the Amended Complaint, Defendants' conduct was intended to and did

prevent Mr. Stradtman from continuing as CEO of Otto. Republic's unjustified decision to redirect, cancel, and withdraw orders from Otto caused Mr. Stradtman to be unable to fulfill the legal requirements of his position, and to fulfill his fiduciary duties. *Am. Compl.* ¶ 73 ("This also had a severe impact on Otto's projected revenues and the anticipated compensation of the many employees who reported to Mr. Stradtman, all of whom Mr. Stradtman owed a fiduciary duty to act in their best interests . . . .") Mr. Stradtman had no choice other than to leave Otto to avoid violating the law.

In addition, as a result of the retaliation that Mr. Stradtman was suffering, the Company had already sustained $3 million in losses of its business with Republic, and he had been warned the losses would continue and be exponentially larger until the issue of, "Who at Otto married Jennifer Taylor" was resolved. *Am. Compl.* ¶ 77, 80-86. Moreover, as a result of Otto's actions – which violated a contract between the Parties, Mr. Stradtman was unable to timely obtain necessary funding and bank financing for Otto's operations. *Am. Compl.* ¶ 87.

By that time, Otto had sustained $10 million in annualized losses in the East Region. *Am. Compl.* ¶ 88-89. But for Defendants' actions, Mr. Stradtman would have remained in his position as CEO and would continue to realize the benefits of his employment with Otto. However, given Republic's conduct, he had no choice other to resign.

## II. MS. TAYLOR HAS CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATION

To meet a prima facie case, a plaintiff must show merely that:

(1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

Here, Defendants challenge only whether Ms. Taylor was performing her job duties well, the identity of her potential comparators, and whether she suffered an adverse employment action.   Ms. Taylor received raises and bonuses throughout her employment, and none of the performance issues alleged against her were found to have merit.   Given that Ms. Taylor was the only female director in the Region office, and that all of her identified colleagues and co-workers under Mr. Krall's supervision were males, Ms. Taylor has identified that she was treated differently than others in the Region.   These issues alone present factual disputes that should be decided by a trier of fact.

Moreover, Ms. Taylor was subject to multiple adverse employment actions, including restrictions of her travel, false performance criticisms, the denial of her synergy bonus, and, ultimately, her termination.

## CONCLUSION

For the reasons stated above, Defendants Republic Services, Inc. and Republic Services of Virginia, LLC's Motion for Summary Judgment should be denied.

November 27, 2012                    Respectfully submitted,

                                     */S/ Carla D. Brown*

                                     Elaine Charlson Bredehoft, VSB No. 23766
                                     ecb@cbcblaw.com
                                     Carla D. Brown, VSB No. 44803
                                     cbrown@cbcblaw.com
                                     CHARLSON BREDEHOFT COHEN
                                            BROWN & SAKATA, P.C.
                                     11260 Roger Bacon Drive, Ste. 201
                                     Reston, Virginia 20190
                                     (703) 318-6800  Telephone
                                     (703) 318-6808  Facsimile

                                     *Counsel for Plaintiff, Jennifer J. Taylor*

## **CERTIFICATE OF SERVICE**

I hereby certify on the 27th day of November 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing to the following:

> Raymond C. Baldwin, Esq.
> Rbaldwin@Seyfarth.com
> Michael J. Bauer, Esq.
> mbauer@seyfarth.com
> Leslie V. Maffeo, Esq.
> lmaffeo@seyfarth.com
> Seyfarth Shaw LLP
> 975 F. Street, NW
> Washington, DC 20004
> Telephone:  (202) 828-3583
> *Counsel for Defendants*
>
> *Counsel for Defendants, Republic Services, Inc., Republic Services*
>   *of Virginia, LLC, Jason Callaway, Ronald Krall,*
>   *Douglas Murphy and Christopher Rains*

>           */S/ Carla D. Brown*
>           _____
>           Elaine Charlson Bredehoft, VSB No. 23766
>           ecb@cbcblaw.com
>           Carla D. Brown, Virginia Bar No. 44803
>           cbrown@cbcblaw.com
>           CHARLSON BREDEHOFT COHEN
>                 BROWN & SAKATA, P.C.
>           11260 Roger Bacon Drive, Suite 201
>           Reston, Virginia 20190
>           (703) 318-6800  Telephone
>           (703) 318-6808  Facsimile
>
>           *Counsel for Plaintiff, Jennifer J. Taylor*