IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JENNIFER TAYLOR,            )
                                 )
     Plaintiff,            )
                                 )
     v.                       )     Case No. 1:12-cv-00523-GBL-IDD
                                 )
REPUBLIC SERVICES, INC., et al.,    )
                                 )
     Defendants.        )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the five-day non-jury trial of Plaintiff Jennifer Taylor's claims against Defendants Republic Services, Inc., Republic Services of Virginia, LLC, Jason Callaway, Ronald Krall, Douglas Murphy, Christopher Rains and Daniel E. Jameson for hostile work environment and retaliatory discharge pursuant to Title VII of the Civil Rights Act of 1964. This case concerns Ms. Taylor's claims that she was subject to systematic unwelcome sexual harassment by her former employer and co-workers for four years, which ultimately led to her separation of employment.

On May 11, 2012, Ms. Taylor filed her Amended Complaint in this Court, asserting the following claims: gender discrimination, sexual harassment and hostile work environment in violation of Title VII (Count I); retaliation, retaliatory discharge and hostile work environment in violation of Title VII (Count II); common law wrongful termination of employment for opposing or resisting criminal conduct (Count III); negligent retention of employees (Count IV); tortious interference with business expectancy (Count V); common law conspiracy (Count VI); and intentional infliction of emotional distress (Count VII). Ms. Taylor requested compensatory, punitive and equitable relief.

At the summary judgment stage, only Counts I, II, III and V remained.[1] On December 20, 2012, the Court granted Defendants' Motions for Summary Judgment on Counts I and V of the Amended Complaint, and Partial Summary Judgment on Count II of the Amended Complaint. The Court subsequently granted Defendants' Motion for Summary Judgment on Count III of the Amended Complaint. Based on the remaining claims, the following issues are before the Court.

The first issue is whether Ms. Taylor was subject to a hostile work environment based on her sex in violation of Title VII where she alleges she was subject to disparate travel restrictions, was called a derogatory name by a colleague, was sent a sexually explicit email by a colleague, and was subject to numerous unwelcome sexual advances by her fellow co-workers. The Court holds that Ms. Taylor has not established by a preponderance of the evidence that the work place conduct she complains of was sufficiently severe or pervasive to establish a hostile work environment claim so as to impute liability to Defendants Republic Services, Inc. and Republic Services of Virginia, LLC.

The second issue is whether Defendants retaliated against Ms. Taylor for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964. The Court holds that Defendant Republic Services Inc. retaliated against Ms. Taylor when its Vice President of Human Resources terminated Ms. Taylor's employment forty-two (42) days after she engaged in protected activity.

The third issue is whether Ms. Taylor is entitled to compensatory and punitive damages, attorneys' fees and costs and injunctive relief because she has demonstrated that she was injured as a result of Defendants' discriminatory and retaliatory actions. The Court holds that Ms.

---

[1] On August 17, 2012, the Court granted Defendants' Motion to Dismiss as to Counts III, IV, VI and VII. On December 14, 2012, the Court granted Plaintiff's Motion for Reconsideration and reinstated Count III.

2

Taylor is entitled to (1) compensatory damages, (2) front pay, (3) back pay, and (4) attorneys' fees and costs against Defendant Republic Services, Inc.

## I. STANDARD OF REVIEW

In a non-jury case, the court must make specific findings of fact and separately state its conclusions of law. Fed. R. Civ. P. 52(a)(1). The trial judge has a function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable. *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957) (citation and internal quotation marks omitted). The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. *Id.* (citation and internal quotation marks omitted); *see Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) (internal quotation omitted) (stating that the fact finder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889 (4th Cir. 1964).

To satisfy the demands of Rule 52(a), a trial court must do more than announce statements of ultimate fact. *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986) (citation omitted). The court must support its rulings by spelling out the subordinate facts on which it relies. *Id.*

The language of Rule 52 has been construed,

> not to require a court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence.

*Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962). This rule does not require that the trial court set out findings on the myriad of factual questions that arise in a case. *Golf City, Inc. v. Wilson Sporting Goods*, 555 F.2d 426, 433 (5th Cir. 1977). The sufficiency of the trial court's findings depends upon the particular facts of each individual case, and no general rule can govern. *Darter*, 301 F.2d at 75.

## II. FINDINGS OF FACT

The following are findings of fact made by the Court after having had an opportunity to observe the witnesses, consider the evidence, and weigh the demeanor and credibility of the witnesses. All of the events giving rise to this action took place while Plaintiff Jennifer Taylor worked at Allied Waste Industries, Inc. ("Allied") and Republic Services of Virginia, LLC ("Republic" or "the Company"), which are solid waste collection, transfer, recycling and disposal companies.

In May 2007, Plaintiff Jennifer Taylor began her employment with Allied as the Director of Infrastructure Development for the Northeast Region. At this time, Ms. Taylor worked in Erie, Michigan, but maintained her residence in Toledo, Ohio. In this position, Ms. Taylor was responsible for all real estate transactions and construction projects in the region.

In December 2008, Allied merged with Republic, a wholly owned subsidiary of Republic Services, Inc. ("Republic Inc."). Republic is comprised of four separate regional business operating units or regions. Each region is headed by a senior vice-president of operations who functions as the chief executive officer. Within each region there exists a number of areas devoted to various business units. The areas are headed by area presidents, who each direct their respective business unit with the assistance of general managers.

In early 2009, Ms. Taylor assumed the position of Director of Municipal Services for the East Region and relocated to Centreville, Virginia. In this role, Ms. Taylor was responsible for working closely with various districts and divisions within Republic to carry out strategies involving the sale of contracts for trash collection to local governments and businesses in the East Region. She oversaw a team of thirteen municipal sales persons in fourteen states. Ms. Taylor and the Regional Directors of Municipal Sales from three other regions reported indirectly to Daniel Jameson, Vice President of Municipal Services and Government Affairs at Republic. Ms. Taylor's immediate or dotted-line supervisor was Douglas Murphy, Vice President of Sales for the East Region. Ms. Taylor ultimately reported to Ronald Krall, Senior Vice President for the East Region.

Ms. Taylor testified that she first experienced sexual harassment while working at Allied. She attended a work-related social event one evening in April or May 2008 at a restaurant called Ralphie's in Ohio. Jason Callaway had recently been selected to be the Vice President of Human Resources for the Northeast Region and, during the course of the evening, Ms. Taylor engaged in conversation with Mr. Callaway regarding the neighborhood where she lived as Mr. Callaway was relocating to the Toledo area for his new position. At the conclusion of the evening, Ms. Taylor offered to take Mr. Callaway and Christopher Hill, a colleague at Allied, back to their

hotel, which was en route to her home. During the car ride, Ms. Taylor and Mr. Callaway continued to discuss her neighborhood and the school system. Ms. Taylor invited Mr. Callaway to stop by her home next time he was in town.

Ms. Taylor was shocked when Mr. Callaway arrived at her home around 11:30 p.m. that evening. Mr. Callaway stated that he had come over for a brief tour of Ms. Taylor's home. While Ms. Taylor had suggested that Mr. Callaway could come to see her home and neighborhood on his next visit to Toledo, she was merely offering to show him and his family her home and neighborhood as a possible area to consider as Mr. Callaway and his family relocate to Toledo. Ms. Taylor emphatically denies enticing Mr. Callaway to come to her home that evening for a sexual tryst.

Ms. Taylor invited Mr. Callaway into her home in part because of his position in the Company as Vice President of Human Resources. She exchanged small talk with Mr. Callaway and proceeded to give him a brief tour of the first floor of her home, which then was in the midst of renovations. As Ms. Taylor was showing Mr. Callaway the dining area, she noticed that he seemed to be getting uncomfortably close to her. At Mr. Callaway's insistence, she made him a drink. Mr. Callaway did not want to drink alone, so at his suggestion Ms. Taylor poured herself a drink.

Mr. Callaway then asked to see the upstairs level of her home. Ms. Taylor interpreted Mr. Callaway's request to "go upstairs" as a solicitation for sex. While Mr. Callaway did not make any explicit comments to her or attempt to touch her, Ms. Taylor could discern Mr. Callaway's purpose and intention. She told Mr. Callaway that he could not see the upstairs level of her home and asked Mr. Callaway to leave. Mr. Callaway left without incident.

There was conflicting evidence at trial about whether Ms. Taylor reported this incident to Area President for the East Region, Heath Eddleblute, approximately six to eight weeks later. However, in May or June of 2009, over an after-hours dinner, Ms. Taylor told co-worker Angela Leonard, the East Region Director of Environmental Compliance, that Mr. Callaway had made an uninvited visit to her home in 2008.

The second instance of unwelcomed sexual advances occurred in October 2008 at a Managers' Conference in Tampa, Florida. The conference was widely attended by Allied managers and staff. Ms. Taylor described an incident with James Van Weelden, an Allied Vice President, at a conference dinner event. Ms. Taylor and Mr. Van Weelden engaged in a work related conversation at the dinner event. Once they arrived at the conference hotel, Ms. Taylor and Mr. Van Weelden sat and talked in an area leading to the entrance of the hotel. Ms. Taylor stated that the conversation was interrupted several times by co-workers walking by on the way into the hotel. Despite the interruptions, Mr. Van Weelden wanted to continue his conversation with Ms. Taylor and he suggested they go to his hotel room as it was "more private" and "more comfortable." Ms. Taylor agreed to meet Mr. Van Weelden at his hotel room. She testified that she was surprised to learn that Mr. Van Weelden had a double hotel room, rather than a suite. Ms. Taylor stated that she assumed Mr. Van Weelden had a separate seating area away from his bedroom. When she entered the room, Mr. Van Weelden directed Ms. Taylor to his balcony where they could continue their conversation. Ms. Taylor stated that she told Mr. Van Weelden that she felt uncomfortable being in his room. Mr. Van Weelden then proceeded to tell Ms. Taylor that he was a happily married man with a family and that he had never done anything like this before. Mr. Van Weelden told Ms. Taylor that he thought it could be bad for both of them if she shared with anyone that she had come to his hotel room. Ms. Taylor agreed and left the hotel

room. Ms. Taylor testified that Mr. Van Weelden did not make any overt sexual advances toward her or touch her, and she did not have any further contact with him that she interpreted as a sexual advance. Over the remainder of her employment, Ms. Taylor and Mr. Van Weelden worked on projects and remained friendly. On occasion, she invited him to lunch, to partake in karaoke and to play golf. Ms. Taylor did not report this incident to management until November 18, 2009.

Following the merger of Allied and Republic in December 2008, Ms. Taylor was hired for a new position with Republic Services of Virginia, LLC. Ms. Taylor observed that her new manager, Douglas Murphy, was demanding and a stickler for office hours. He micromanaged her work-related travel and treated her in a condescending manner while in the presence of other managers and staff during meetings. Ms. Taylor was also experiencing issues with the management style of Senior Vice President of Operations, Ronald Krall. Mr. Krall and Mr. Murphy had been Republic, not Allied, employees. Ms. Taylor testified that Mr. Krall began micromanaging her work. She stated that she felt that Mr. Krall's management style undermined her authority with her subordinates when he questioned her judgment, openly criticized her and fabricated performance issues. Mr. Krall sought to rein in Ms. Taylor's business marketing travel. He questioned her and other managers about the value of her presence at every out-of-town meeting she attended, as well as meetings she had with her regional counterparts and dotted-line supervisors. Ms. Taylor testified that Mr. Krall and Mr. Murphy severely limited her travel in a way that impacted her performance.

In June 2009, Mr. Murphy was very displeased with Ms. Taylor's performance. He and Mr. Callaway, who was now the Vice President of Human Resources for the East Region, called Ms. Taylor into an office to discuss placing her on a performance improvement plan. Mr.

Murphy explained that he had concerns about Ms. Taylor's attendance at work, her ability to meet deadlines and the accuracy of her work.   Ms. Taylor considered the allegations and asked for an opportunity to respond to the performance improvement plan.   Mr. Callaway agreed to allow Ms. Taylor the opportunity to refute the claims.   Ms. Taylor met with Mr. Callaway and presented information, memoranda and data showing where she traveled, the individuals with whom she met and how these visits advanced company business.   Mr. Callaway then spoke to Mr. Murphy and discussed Ms. Taylor's response to the performance improvement plan and her documentation.   After that discussion, Mr. Callaway determined that the performance improvement plan was unjustified and that it would be withdrawn.

Ms. Taylor testified that the third incident of unwelcome sexual advances occurred when Mr. Callaway met with her on a Friday afternoon to discuss the performance improvement plan. He told Ms. Taylor that he felt her issues with Mr. Murphy were a result of miscommunication and that the performance improvement plan would be withdrawn.   Ms. Taylor testified that after Mr. Callaway gave her the news that the performance improvement plan would be withdrawn, he propositioned her and asked her to have sex with him in an empty office.   Ms. Taylor inferred that Mr. Callaway was asking for a sexual reward for having the performance improvement plan withdrawn.   Ms. Taylor testified that, throughout the remainder of her employment at Republic, Mr. Callaway continued his unwelcome advances toward her.   Nonetheless, Ms. Taylor conducted herself in a professional manner with Mr. Callaway.   She met with Mr. Callaway to complain about Mr. Murphy's treatment of her on various occasions throughout April, May and June of 2009.

On October 31, 2009, Ms. Taylor's boxing gym was hosting a Halloween party for its members.   Ms. Taylor and Jody Boyce, a Human Resources Representative, who also attended

the gym and worked in her office, agreed to have dinner and attend the Halloween party. Ms. Taylor and Ms. Boyce were acquaintances through work, and Ms. Taylor was aware that Ms. Boyce reported directly to Mr. Callaway. During the dinner conversation, Ms. Taylor told Ms. Boyce that Mr. Callaway had come to her home, unannounced, and made a sexual advance toward her in May 2008. Additionally, Ms. Taylor told Ms. Boyce that Mr. Callaway had propositioned her to go to an empty office to have sex and persistently asked her go to lunch, dinner and the movies with him. Ms. Taylor told Ms. Boyce that she had saved documentation relating to her interactions with Mr. Callaway in the event that Mr. Callaway tried to interfere with her job or she was terminated.

Ms. Boyce stated that she felt that Ms. Taylor was trying to set the company up, and reported the conversation to Angela Leonard, Director of Engineering and Environmental Management for the East Region. Ms. Boyce was aware that Ms. Taylor had previously told Ms. Leonard about Mr. Callaway's 2008 visit to her home. Ms. Boyce and Ms. Leonard talked about Ms. Taylor's allegations and they mutually agreed to speak to Mr. Callaway. Thereafter, they met with Mr. Callaway, described Ms. Taylor's allegations, and suggested that Mr. Callaway report the information to Ronald Krall, Senior Vice President of the East Region. Once Mr. Krall had spoken to Mr. Callaway, and was in receipt of statements prepared by Ms. Boyce and Ms. Leonard, he contacted Catherine Ellingsen, then Vice President and Deputy General Counsel for the East Region for Republic Inc. to report the information he had received. Mr. Krall then forwarded the statements prepared by Ms. Boyce and Ms. Leonard to Ms. Ellingsen.

On November 9, 2009, Ms. Ellingsen traveled from the corporate office for Republic Inc. in Arizona to Virginia to conduct an investigation to determine whether Ms. Taylor was, in fact, attempting to set up the Company or whether Mr. Callaway had acted inappropriately by visiting

Ms. Taylor's home in May 2008. Ms. Ellingsen interviewed Ms. Boyce, Mr. Murphy, Mr. Callaway, Ms. Leonard, Christopher Hill and Ms. Taylor, while Deputy General Counsel Andrew Sweet was present on the telephone. Ms. Taylor was interviewed last, and her interview lasted approximately two hours. Ms. Ellingsen began her interview with Ms. Taylor without stating that her purpose was to investigate a sexual harassment allegation. Instead, Ms. Ellingsen asked Ms. Taylor the open-ended question of whether she had any issues with members of the regional staff. Ms. Taylor testified that she told Ms. Ellingsen about her issues with Mr. Murphy. She told Ms. Ellingsen that she felt Mr. Murphy had given her a hard time regarding her arrival time to the office, restricted her ability to travel and criticized her performance without providing any leadership or guidance at work. Ms. Taylor did not mention Mr. Callaway's name until Ms. Ellingsen intervened and asked whether Ms. Taylor would be surprised to learn that management had been told that someone in the Company had made unwelcome sexual advances toward her. Despite Ms. Ellingsen asking several questions about the evening in which Mr. Callaway allegedly visited her home in May 2008, Ms. Taylor initially did not want to report the Callaway incident. Ms. Taylor claimed that the evening ended when she dropped Mr. Callaway off at his hotel. She stated that later in the evening Mr. Callaway contacted her on her cell phone with a "come on" line, which she declined. Ms. Taylor did not mention that Mr. Callaway visited her home that evening. Ms. Taylor did, however, mention that Mr. Callaway asked her to lunch, but she declined.

Ms. Ellingsen conducted a second interview of Ms. Taylor on November 18, 2009, and at that time Ms. Taylor disclosed the encounter with Mr. Callaway. Ms. Taylor testified that she was reluctant to report the incident because Mr. Callaway was a newly hired high-ranking company official and she had to continue to work with him and other men in the workplace. Ms.

Taylor told Ms. Ellingsen that she was upset that Ms. Boyce reported her conversation about Mr. Callaway to management.  Ms. Taylor then told Ms. Ellingsen about the details of Mr. Callaway's visit to her home, namely that he showed up uninvited to her home late in the evening, and sexually propositioned her.

Ms. Taylor then described how she was generally treated by men in the workplace.  She told Ms. Ellingsen that it was not uncommon for her male colleagues to make sexual advances toward her.  Ms. Ellingsen attempted to get more information about these incidents, but Ms. Taylor refused to identify the names of the individuals because, in her view, no one had "crossed the line like Mr. Callaway."  Later in the meeting, Ms. Taylor agreed to provide Ms. Ellingsen with the details of unwelcome sexual advances at Republic involving seven men.  Ms. Taylor was afraid to identify the men by name.  She identified each person by letters "A" through "G" and stated that each man made unwelcome sexual advances or expressed interest in her, which she interpreted as a sexual advance or interest in having sex with her although in some instances the words "I want to have sex with you" were not explicitly stated.

Ms. Taylor described several incidents that had occurred with Mr. Callaway, Mr. Van Weelden, Mr. Pickens, Mr. Eddleblute[2] and two other unidentified male colleagues.  Ms. Taylor did, however, tell Ms. Ellingsen that these individuals were not her direct or indirect supervisors. Despite this information, Ms. Ellingsen was unable to ascertain the identity of these individuals.

Ultimately, Ms. Ellingsen was unsure about what occurred at Ms. Taylor's home in 2008. Nevertheless, she concluded that Mr. Callaway, as Vice President of Human Resources for the East Region, exhibited poor judgment by visiting Ms. Taylor's home late at night, uninvited, after a work-related event.  Ms. Ellingsen recommended that Mr. Callaway be disciplined.

---

[2] Ms. Taylor testified at trial that Mr. Eddleblute made two sexual advances toward her between 2008 and 2010. Mr. Eddleblute countered her testimony, and proclaimed that he and Ms. Taylor engaged in consensual sexual relations throughout that time period.

Shortly thereafter, Ronald Krall issued Mr. Callaway a written disciplinary memorandum reprimanding him for his unwelcome contact with Ms. Taylor at her home.

Ms. Ellingsen was concerned that Ms. Taylor would continue to have to deal directly with Mr. Callaway on personnel matters following the reprimand. Therefore, she told Ms. Taylor that in the future she should contact her, and not Mr. Callaway, if she had any concerns relating to her employment. Ms. Ellingsen directed Mr. Callaway that he was to have no responsibility or contact with Ms. Taylor about human resources matters going forward as Ms. Ellingsen would personally handle Ms. Taylor's human resources needs. Despite this directive, evidence adduced at trial demonstrated that Mr. Callaway continued to be involved in employment issues associated with Ms. Taylor. Mr. Callaway continued to review matters with Ms. Taylor's supervisors and was copied on various emails pertaining to Ms. Taylor. Ms. Taylor did not contact Ms. Ellingsen regarding any workplace concerns until August 12, 2011.

In June 2010, Christopher Rains became the Vice President of Sales for the East Region, replacing Douglas Murphy as Ms. Taylor's supervisor. At this time, Ms. Taylor had not only met, but exceeded her 2010 company revenue goals for retention and net new sales, and she had successfully participated in the development of the Customer Relationship Management System ("CRMS2") tool and training. Mr. Rains testified that Ms. Taylor's role as the Municipal Director of Sales was to influence her indirect reports without formal authority and to be the right hand of the area presidents as it relates to market strategy and organizational design. Mr. Rains stated that he thought that Ms. Taylor was lacking in this area, and she had a number of deficiencies, including that she (1) repeatedly failed to meet deadlines, (2) had conflicts with her subordinates, (3) struggled to get "buy in" from other managers, (4) had poor organizational skills, (5) had difficulty analyzing pro formas, (6) struggled to establish priorities, and (7) failed

to regularly follow up with him during his supervision. Mr. Rains testified that he thought Ms. Taylor's needs could be managed, so he gave her more direction and sent her to a management course. He did not note that his initial concerns about Ms. Taylor led him to consider placing her on a performance improvement plan or terminating her employment.

Turning back to Ms. Taylor's hostile work environment claim, Ms. Taylor testified about a fourth incident with a male Republic manager making unwelcome sexual advances toward her. In September 2010, Ms. Taylor accepted an invitation to attend the Ryder Cup in Wales, U.K. with Otto Environmental Services ("Otto"), a preferred vendor for Republic. Steve Stradtman, Chief Executive Officer of Otto, who at the time was Ms. Taylor's boyfriend and is now her husband, asked her to go to the event as his guest. Robert Pickens, Republic's Vice President of Special Waste, and Ms. Taylor both attended the Ryder Cup Golf Tournament as Otto's guests. Until this time, Ms. Taylor enjoyed a friendly relationship with Mr. Pickens. Ms. Taylor testified that at a dinner, Mr. Pickens sat next to her. During the conversation, Ms. Taylor stated that Mr. Pickens made sexually explicit comments to her throughout the two and a half hour dinner that were both insulting and embarrassing to her. At trial, Mr. Pickens flatly denied making any sexually explicit comments to her during dinner. Ms. Taylor did not tell Mr. Stradtman about Mr. Pickens's sexually explicit remarks at or following the event. Ms. Taylor did not report this incident to management or Ms. Ellingsen.

Following the Ryder Cup incident, Ms. Taylor continued to work on projects with Mr. Pickens. She even had what she described as "playful banter" with Mr. Pickens in emails after the 2010 Ryder Cup. In one email, Ms. Taylor referred to Mr. Pickens as the "nicest, sweetest, most successful man in the world ☺." In another email, she referred to him as "1st in [her] book

: )." Ms. Taylor now, however, takes issue with one statement that Mr. Pickens made in an email dated August 15, 2011 where he writes that he will be her "huckleberry."

The final incident of sexual harassment occurred during a February 2011 General Managers' Conference in Phoenix, Arizona. Ms. Taylor contends that Republic Manager, Keith Cordesman, called her a "fucking bitch" during a bean-bag toss game. She contends that she overheard the comment when Mr. Cordesman was talking with a group of people not involved in the game approximately 20 –25 feet away from her across the field. While Ms. Taylor did not immediately report this alleged comment to management, she did subsequently inform Mr. Rains that she believed Cordesman had called her a "bitch." Mr. Rains reported the allegation to Mr. Cordesman's supervisor, Area President Heath Eddleblute. Mr. Eddleblute confronted Mr. Cordesman, who denied making the comment.

In February 2011, Ms. Taylor received her 2010 evaluation from Mr. Rains. He rated her performance as "not meeting expectations." The review noted Ms. Taylor's struggles to influence people (get their "buy-in") and with organizational issues, but also noted Ms. Taylor's strengths in communications and presentation.

Following the annual review, Mr. Rains increased his involvement with Ms. Taylor so that she could regain her good standing within the Company. He offered assistance to Ms. Taylor so that she could improve her performance, including having Republic pay for her to attend a project management class so that she could further build her skill set. Republic would often offer professional development to those employees who needed coaching or tools to be successful. Once Republic determines that the employee neither has the skillset nor the desire to do his job, the employee is placed on a performance improvement plan where he is formally warned that if his performance does not improve he may be terminated. Initially, Ms. Taylor's

performance improved.  She was meeting deadlines, and Mr. Rains was relatively pleased with Ms. Taylor's progress.  However, Mr. Rains testified that by mid-June 2011, Ms. Taylor's performance had regressed.  She was missing deadlines and was not communicating with him or her team as frequently as she had in the past, which gave Mr. Rains cause for concern.  Mr. Rains was contemplating placing Ms. Taylor on a performance improvement plan when he learned of a conversation Ms. Taylor had with area presidents, Drew Isenhour and Dean DiValerio, without his consent.  According to Ms. Taylor, Mr. Rains suggested changes in the field reporting structure.  In response to this conversation, Ms. Taylor immediately contacted Shawn Brady, Mr. Isenhour, and Mr. DiValerio to discuss how the proposed change would impact their positions.  Mr. Rains had not intended to share his idea, which was in the consideration stage with managers.  Ms. Taylor told Mr. Rains that she had spoken with Mr. Brady, Mr. Isenhour and Mr. DiValerio about the proposed changes and shared their collective disapproval of the proposed plan.  Mr. Rains testified that he was astonished that Ms. Taylor had spoken to the area presidents without first speaking to him about a proposal which neither Mr. Rains nor Mr. Krall had the authority to implement.

On August 11, 2011, Mr. Krall sent individual emails to Ms. Taylor and other Republic employees whose positions involved travel, reminding them to use the travel calendar.  Mr. Callaway was copied on the email.  When Ms. Taylor did use the travel calendar, Mr. Krall questioned whether Ms. Taylor's attendance at a particular conference added any value.

On August 12, 2011, Ms. Taylor emailed Ms. Ellingsen stating that she suspected retaliation and discrimination from Mr. Rains as a result of the 2008 incident with Mr. Callaway, and she feared that each day she went to work she would either be terminated or humiliated.  She spoke with Ms. Ellingsen later that day regarding her email.  During the phone call, Ms.

Ellingsen asked Ms. Taylor for information about the basis of her suspicion. Ms. Taylor discussed a variety of issues, including her belief that Mr. Rains did not appropriately value her performance, that Mr. Krall micromanaged her, and that she was treated differently from her region counterparts in terms of her ability to travel for her job. She told Ms. Ellingsen that she felt as though Mr. Callaway placed a target on her back. Despite Ms. Ellingsen's assurance that Mr. Callaway would not be involved in her personnel matters, Ms. Taylor stated she had reason to believe that he remained involved in her personnel matters. While Ms. Taylor had not met with Mr. Callaway directly about her human resources needs, she noted that Mr. Callaway was listed as a recipient on emails pertaining to her. She inferred that supervisors would not need to send Mr. Callaway information about her unless he had a role in her personnel matters. Additionally, Ms. Taylor forwarded Ms. Ellingsen three emails, which she believed supported her suspicions of disparate treatment.

The first email, dated December 2, 2010, involved an email exchange between Mr. Krall, Mr. Rains, Mr. Jameson and Gary Sova, Executive Vice President of Marketing and Sales, questioning Ms. Taylor's attendance at a conference in Denver, Colorado, specifically asking why the conference was being handled by someone in the East Region when it could have been handled by others. Ms. Taylor found this email to be an example of Mr. Krall's hostility toward her.

The second email, dated August 3, 2011, involved a discussion between Ms. Taylor and her dotted line supervisor, Daniel Jameson, regarding the Recycle Bank Program. Although Ms. Taylor did not think that Mr. Jameson was trying to get her fired, she was upset with the tone that Mr. Jameson took in the email.

The third email, dated August 11, 2011, was sent from Mr. Krall to Ms. Taylor reminding her to use the travel calendar when traveling. According to Ms. Taylor, the email was retaliatory because Mr. Krall copied Mr. Callaway on the message. As a final example of discrimination, Ms. Taylor told Ms. Ellingsen that at the General Managers' Conference in February 2011, her colleague, Keith Cordesman called her a "fucking bitch" during a bean-bag toss game.

Following the call with Ms. Taylor, Ms. Ellingsen looked into Ms. Taylor's allegations that her travel was restricted as compared to her male counterparts in other regions. As to Ms. Taylor's concerns about harassment and retaliation, Ms. Ellingsen decided, without investigating, that Ms. Taylor's complaints had no merit. Ms. Ellingsen did not speak with Mr. Jameson or Mr. Krall about Ms. Taylor's concerns that they may have known about her prior sexual harassment complaint and whether Ms. Taylor was being retaliated against by management. Ms. Ellingsen testified that, in her judgment, there was no need to investigate the remainder of Ms. Taylor's concerns because there were no allegations that could reasonably be considered retaliation, discrimination or harassment.

Without investigating Ms. Taylor's allegations of retaliation, Ms. Ellingsen advised Ms. Taylor of her belief that Ms. Taylor's concerns were largely rooted in her dislike of her supervisors' management styles. Ms. Ellingsen testified that she then discussed Ms. Taylor's perceptions. First, she discussed with Ms. Taylor whether some type of intervention with Ms. Taylor's supervisors may help resolve Ms. Taylor's concerns. As she thought aloud, Ms. Ellingsen offered three options to Ms. Taylor: (1) she could remain in her current position and work out any frustrations she has; (2) Ms. Ellingsen could find her a different position within the Company in a different region; or (3) she could resign and leave the Company with a severance package. The parties dispute whether Ms. Taylor immediately rejected the first option. Ms.

Ellingsen and Ms. Taylor agreed to give these and other options more thought and reconnect in the next few weeks.

Around August 18, 2011, Mr. Rains contacted Ms. Ellingsen to discuss moving Ms. Taylor from a professional development program to a formal performance improvement due to her performance issues. Following this discussion, Ms. Ellingsen worked with Mr. Rains on scheduling a performance improvement process discussion he intended to have with Ms. Taylor on August 29, 2011.

In preparation for the meeting with Ms. Taylor, Mr. Rains sent an email to Ms. Ellingsen, Mr. Krall and Mr. Callaway on August 25, 2011 detailing the basis of his concerns regarding Ms. Taylor's performance. The email outlined concerns that Mr. Rains had not previously discussed with Ms. Ellingsen. Mr. Rains was upset about circumstances that occurred when Ms. Taylor attended the "WasteCon" conference, a national conference for the waste industry, on August 22 –25, 2011. The conference was scheduled to begin on Monday, August 22, 2011. Ms. Taylor told Mr. Rains that she was leaving for the conference on Sunday, August 21, 2011. However, she actually left for the conference on Friday afternoon, August 19, 2011. When asked, Ms. Taylor told Mr. Rains that she left early because Mr. Jameson asked her to help set up the Company's booth. It was later revealed that Mr. Jameson did not ask Ms. Taylor to leave early to set up the booth rather, she volunteered to do it.

Mr. Rains was also upset with Ms. Taylor because on Friday, August 19, 2011, Ms. Taylor was participating in a conference call on her cell phone. While the call was ongoing, Ms. Taylor became disconnected. Ms. Taylor was also to host a conference call with the Ohio Regional Director while she was at the conference on August 23, 2011, that she ultimately missed. At trial, Ms. Taylor explained that at the time of the conference call she was engaged in

a conversation with a customer. She decided on her own, without telling Mr. Rains, that she need not participate in the conference call because she "did not see much value" in it. Following the conversation between Ms. Ellingsen and Mr. Rains, Ms. Ellingsen instructed him to go forward with the meeting with Ms. Taylor, and instructed him to advise Ms. Taylor to take the remainder of the day off if she raised issues with which he was unfamiliar.

On August 29, 2011, Mr. Rains met with Ms. Taylor for their previously scheduled meeting to discuss the issues he perceived with her performance. At this time, Mr. Rains was not aware of Ms. Ellingsen's 2009 investigation or Ms. Taylor's August 12, 2011 email to Ms. Ellingsen asserting allegations of harassment, discrimination and retaliation. At the meeting, Mr. Rains told Ms. Taylor that she had missed numerous deadlines, missed the conference calls scheduled on August 19, 2011 and August 23, 2011, and accused her of being untruthful about being asked to set up the Company's exhibit booth at WasteCon. During their conversation, Ms. Taylor told Mr. Rains that she did not believe that he was retaliating against her. Rather, Ms. Taylor told Mr. Rains that she believed he was being used as a pawn by Mr. Krall and Mr. Callaway to retaliate against her. Consequently, Mr. Rains directed Ms. Taylor to take the rest of the day off and that Ms. Ellingsen would be in contact with her.

After Ms. Taylor was sent home that day she frantically emailed Ms. Ellingsen expressing her disappointment in not hearing from her sooner. Ms. Taylor also explained that Mr. Rains had sent her home from work following her meeting with him that morning. Throughout the day, Ms. Taylor and Ms. Ellingsen had a series of telephone conversations. Ms. Taylor reiterated her previous retaliation claims, and raised several new claims. In addition to the matters Ms. Taylor complained about earlier, she also explained that she was being discriminated against by not being paid a synergy bonus, which she claimed, was awarded to her

male counterparts in the West, Midwest and South regions. The next day, Ms. Taylor contacted Mr. Rains and Ms. Ellingsen by email to determine when she could return to work. Mr. Rains told Ms. Taylor that she should plan on staying home the following day, and that Ms. Ellingsen would be in touch with her.

Following their second discussion, Ms. Ellingsen investigated two matters. First, Ms. Ellingsen looked into Ms. Taylor's allegations regarding the synergy bonus. She confirmed that the vice presidents of the East and West Regions had previously determined that the municipal sales directors in their regions would not be eligible to receive synergy bonuses. Therefore, contrary to Ms. Taylor's contention, her male counterpart in the West region did not receive a synergy bonus. Second, Ms. Ellingsen explored Mr. Rains's concern that Ms. Taylor was dishonest about her reason for leaving work early on August 19, 2011. She spoke with Mr. Jameson, who confirmed that Ms. Taylor was not asked to leave work on Friday to help set up the Company's booth at the WasteCon conference. Mr. Jameson provided Ms. Ellingsen a copy of the memorandum he had sent to Ms. Taylor and other employees who were to attend the WasteCon conference advising them that he had hired a third-party contractor to set up the booth. Ms. Ellingsen confronted Ms. Taylor with this information, and Ms. Taylor acknowledged that she was not asked to physically erect the exhibitor display booth. Rather, Ms. Taylor stated, she volunteered to purchase supplies, candy and gifts for customers who visited the booth as she had done in previous years. Ms. Ellingsen advised Ms. Taylor that, based on her having been untruthful about her justification for leaving early on August 19, 2011, the second option that had been proffered—of finding Ms. Taylor a different position within the Company—was no longer on the table. Ms. Ellingsen and Ms. Taylor spoke by telephone to discuss the WasteCon exhibit booth timing issue.

On September 6, 2011, Ms. Ellingsen forwarded a severance agreement to Ms. Taylor for her review and signature. Ms. Taylor was very concerned about how it would look if she abruptly left the Company without any notice to her customers, subordinate sales staff, and colleagues. She was also concerned about her prospects for future employment. Ms. Taylor asked Ms. Ellingsen to allow her to participate in drafting an out-of-office message for her work email account. The following day, Ms. Taylor drafted an automatic reply for her work email account announcing that she was leaving the Company on September 23, 2011. Ms. Taylor followed with an email to Ms. Ellingsen on September 8, 2011 acknowledging receipt of the severance agreement and telling Ms. Ellingsen that she did not understand why she was being terminated, and that she felt she was being further retaliated against by Republic after she had reported retaliation.

Ms. Taylor subsequently filed an EEOC Charge on September 9, 2011 asserting discrimination, retaliation and hostile work environment claims. Ms. Taylor ultimately declined to accept Republic's severance package because she did not want to lose her job and the severance package required her to sign a legal release of all claims against Republic. The proposed severance package was approximately $50,000. Ms. Taylor's last day of employment was on September 23, 2011.

At trial, Ms. Taylor testified that she was aware of Republic's anti-harassment policy and had even taken several sexual harassment training sessions. According to Republic's anti-harassment policy, any employee who believes that they have been subjected to any form of harassment prohibited by its policy are directed to contact their immediate supervisors, or "a management representative with whom the employee is comfortable reporting the conduct, such as the Site or Area Manager, the Regional Human Resources Manager, a Corporate Human

Resources Manager, or by calling the AWARE Line." The policy goes on to state that Republic will not take any adverse action against an individual who makes a good faith report of harassment or discrimination.

Ms. Taylor testified that, as a result of her losing her job, she feels victimized and hopeless. Psychiatrist Ryan S. Shugarman, M.D. testified that as a result of the adverse experiences Ms. Taylor experienced at Republic, she suffers from major depressive disorder, single episode mild adjustment disorder with anxiety, and the exacerbation of an eating disorder.

Ms. Taylor acknowledged that her post-termination job search was difficult due to the non-compete agreement she signed after the Allied –Republic merger. Ms. Taylor was not able to find a job in the waste management industry. At the time she left Republic, Ms. Taylor's annual base salary was $170,550. Ms. Taylor testified that had she remained at Republic until the end of 2011, she would have received an additional $52,000 bonus, $18,000 in stock options, and between $6,000 and $7,000 from her employee stock purchase plan.

Ms. Taylor searched for a comparable new job to replace the income she earned at Republic. After searching for a non-waste related sales position for ten months, she ultimately found a position in an unrelated industry making substantially less money than she earned at Republic. At the time of trial, Ms. Taylor was employed by Vector Disease Control as a sales representative earning a base salary of $80,000 per year.

### III. CONCLUSIONS OF LAW

#### A. HOSTILE WORK ENVIRONMENT

The first issue before the Court is whether Ms. Taylor has met her burden of proof by a preponderance of evidence on her claim for hostile work environment where she alleges she was subject to disparate travel restrictions, called a derogatory name by a colleague, was sent a

sexually explicit email by a colleague, and was subject to numerous unwelcome sexual advances by her fellow co-workers. The Court finds for Defendants Republic and Republic Inc. on this claim because Ms. Taylor has not demonstrated by a preponderance of evidence that several of the alleged incidents actually occurred. As to those incidents that the Court finds did occur, the Court finds, considering the evidence as a whole, that the alleged unwelcome conduct is not sufficiently severe or pervasive as to result in a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. Furthermore, Defendants have sufficiently demonstrated that they exercised reasonable care to prevent and promptly correct any allegedly sexually harassing behaviors and that Ms. Taylor unreasonably failed to take advantage of the corrective or preventive opportunities available.

Ms. Taylor alleges that Defendants impermissibly discriminated against her on the basis of sex, in violation of Title VII, through maintaining a hostile work environment. At trial, Ms. Taylor testified that the following incidents support her claim for hostile work environment: (a) she was treated differently than her male counterparts in terms of travel; (b) she was called a "fucking bitch" by colleague Keith Cordesman; (c) she was sent a sexually suggestive email by Robert Pickens; and (d) she was subject to unwelcome propositions for sex by Jason Callaway, James Van Weelden and Robert Pickens.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Although Title VII does not mention sexual harassment, the Supreme Court and the Fourth Circuit have recognized harassment as actionable under Title VII under a "hostile work environment" theory. *Ocheltree v. Scollon Productions,*

*Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). A Title VII harassment claim under the "hostile work environment" theory is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Thus, in order to prevail under a hostile work environment theory, "a female plaintiff must show that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree*, 335 F.3d at 334. Simple teasing, sporadic use of abusive language, offhand comments, jokes related to protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Likewise, general complaints of rude treatment are not sufficient to sustain a hostile work environment claim. *See, e.g., Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006).

### 1. Unwelcome Conduct

"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68 (1986). The evidence adduced at trial demonstrates that Ms. Taylor made complaints, albeit delayed, to numerous colleagues regarding (a) Mr. Callaway's 2008 visit to her home, (b) Mr. Callaway's alleged proposition for sex in 2009, (c) her interaction with Mr. Van Weelden at the Managers' Conference in 2008, (d) Mr. Pickens's alleged explicit remarks to her during a dinner at the Ryder Cup in 2010, (e) Mr. Pickens's "huckleberry" comment in 2010, (f) Mr. Cordesman's alleged comment at a 2011 conference and (g) her contention that her male counterparts traveled without restrictions. Ms.

Taylor, therefore, has sufficiently satisfied this element. Ms. Taylor's distaste for this conduct, however, is not dispositive of whether the conduct alleged was based upon her sex or was sufficiently severe and pervasive to create a hostile working environment.

### 2. Based on Sex

"The critical issue [in the 'because of sex' inquiry] is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Ocheltree*, 335 F.3d at 331 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)) (internal citations omitted). Thus, the conduct underlying a sexual harassment claim need not be sexual in nature as long as the conduct is directed at the employee because of his or her sex. Of the incidents that occurred in this case, some of the conduct was sexual in nature, while other conduct was not. Mr. Callaway's visit to Ms. Taylor's home, Mr. Callaway's alleged propositions for sex, Ms. Taylor's interaction with Mr. Van Weelden at the Managers' Conference, Mr. Pickens's alleged explicit comments at the Ryder Cup, and Mr. Cordesman's alleged comment about Ms. Taylor were directed at her because of her sex.

Ms. Taylor, however, has not demonstrated that she was subject to travel restrictions because of her sex. At trial, Ms. Taylor acknowledged that each of Republic's regions had different budget and travel policies. She also conceded that the East Region did not enjoy an unlimited travel budget, and that Mr. Krall only wanted employees to attend out-of-town conferences and meetings if their attendance added value. The record suggests that Mr. Krall was a stickler on the use of the travel calendar. On August 11, 2011, he sent individual emails to Ms. Taylor and other employees reminding them to consistently use the travel calendar. Ms. Taylor's male counterparts in other regions did not have the same travel restrictions because each region operated autonomously. Therefore, the vice president of each region had discretion to

operate their budget and travel policies as they wished. Ms. Taylor has not demonstrated that other male colleagues at the director-level in the East Region were able to travel more freely than she or that they were subject to less scrutiny on their attendance at out-of-town meetings and conferences. Thus, Ms. Taylor's claim that her travel was restricted based upon her sex is unsubstantiated.

Likewise, Ms. Taylor has not demonstrated that Mr. Pickens's comment that he would be her "huckleberry" was directed to her because of her sex. In her deposition, Ms. Taylor testified that she did not find any of the email exchanges between herself and Mr. Pickens to be sexually harassing. However, at trial she contradicted her prior testimony and now declares that this comment "crossed the line." It is helpful to understand the context of this statement. As the WasteCon conference approached in August 2011, Ms. Taylor sent out an email to a group, which included Mr. Pickens, advertising the "must-attend" events at the conference. One such event was an Elvis Presley impersonator contest. Ms. Taylor asked the group if Mr. Pickens "would be [their] Elvis." Mr. Pickens replied only to Ms. Taylor stating that he would be her "huckleberry." Mr. Pickens testified that he was quoting a classic line from the movie, "*Tombstone*" which means, "I accept your challenge." Being a fan of the movie, Mr. Pickens stated that he felt the comment was appropriate based upon the challenge he had been given. Ms. Taylor produced no evidence to the contrary to suggest that this comment was sexual in nature or directed at her because of her sex. Accordingly, Mr. Pickens's "huckleberry" comment cannot support Ms. Taylor's claim for hostile work environment.

### 3. Sufficiently Severe or Pervasive

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree*, 335 F.3d at 333. First, the plaintiff must show

that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21 –22. Next, the plaintiff must show that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale*, 523 U.S. at 81 –82.

While the subjective test of whether the plaintiff actually found the environment abusive may be readily satisfied in employment discrimination suits, the Supreme Court has acknowledged that the boundaries of what constitutes an objectively discriminatorily hostile work environment is not "a mathematically precise test." *Harris*, 510 U.S. at 22. The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale*, 523 U.S. at 81 (internal quotations and citations omitted). This objective test requires examination of the totality of the circumstances, including "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

As stated above, the only alleged incidents attributable to Ms. Taylor's gender are the following: (a) her interaction with Mr. Van Weelden at a Managers' Conference in Tampa, Florida; (b) Mr. Pickens's alleged explicit comments at the Ryder Cup; (c) Keith Cordesman alleged comment made during a Managers' Conference; (d) Mr. Callaway's visit to Ms. Taylor's home in 2008; and (e) Mr. Callaway's alleged proposition for sex. The Court will proceed to examine the context of each allegation below.

### a. Interaction with Mr. Van Weelden at a Managers' Conference in Tampa, Florida

Ms. Taylor alleges that following a dinner at the Managers' Conference in Tampa, Florida in 2008 that she and James Van Weelden, a Vice President at Allied, shared a business

conversation about landfills. Ms. Taylor and Mr. Van Weelden, along with others, left the restaurant and walked back to their hotel. Along the walkway to the hotel, they took a seat and continued their conversation. As co-workers walked past them, their conversation was interrupted a number of times. As a result, Mr. Van Weelden and Ms. Taylor decided to continue the conversation in his hotel room, which would be more private. Ms. Taylor testified that she assumed that Mr. Van Weelden had a suite with a sitting area where the business conversation would continue. Ms. Taylor went to Mr. Van Weelden's hotel room. When she arrived, she was surprised to learn that Mr. Van Weelden's room was not a business suite. Rather, it was a standard hotel room with two double beds. Mr. Van Weelden then invited Ms. Taylor to sit on the balcony and continue the conversation. After an awkward conversation about his wife and kids, Ms. Taylor left the room. She testified that Mr. Van Weelden did not make any appropriate comments, did not ask her for sex and did not touch her.

Ms. Taylor testified that she willingly continued the discussion because she knew that Mr. Van Weelden was related to the founder of the company, and she wanted to demonstrate her knowledge of the business and build her reputation with management. She subsequently engaged in friendly emails with Mr. Van Weelden inviting him to several outings, including lunch, karaoke and golf.

Ms. Taylor did not raise this incident with anyone until her second interview with Ms. Ellingsen on November 18, 2009. When she did discuss this incident, she refused to identify Mr. Van Weelden by name.

### b.    Mr. Pickens's Alleged Explicit Comments at the Ryder Cup

Ms. Taylor had a friendly relationship with Senior Vice President of Waste for Republic, Robert Pickens. Although she did not work with Mr. Pickens, Ms. Taylor often confided in him

about the issues she had with Mr. Murphy and the 2009 investigation initiated by Ms. Ellingsen. She asked for his help in working with Mr. Murphy because Mr. Pickens had worked with Mr. Murphy for many years. They often engaged in what Ms. Taylor described as "playful banter." Ms. Taylor testified that the email exchanges would get "edgy" but she did not make much of the emails because they were always "joking around."

In September 2010, Ms. Taylor and Mr. Pickens both attended the Ryder Cup Golf Tournament in Wales. Ms. Taylor was dating Steven Stradtman, the CEO of Otto, and was invited to attend the event as his guest. Ms. Taylor alleges that she sat next to Mr. Pickens at a group dinner during the Ryder Cup during which Mr. Pickens made numerous sexually explicit statements to her about what he would do to her sexually that spanned the two-and-a-half hour dinner. Ms. Taylor testified that Mr. Pickens made these explicit statements to her as her boyfriend, Mr. Stradtman, sat across the table from her. Yet, Ms. Taylor and her now-husband testified that she never once told Mr. Pickens to stop making the comments. Nor did she ask to switch seats with another guest or excuse herself from the dinner table. Ms. Taylor testified that she did not tell Mr. Stradtman about Mr. Pickens's sexually explicit statements until months after the event. Ms. Taylor had business dealings with Mr. Pickens after the Ryder Cup and she continued her "playful banter" with Mr. Pickens in emails following the event. In one email, Ms. Taylor referred to Mr. Pickens as the "nicest, sweetest, most successful man in the world ☺." In another email, she referred to him as "1st in [her] book : )."

Ms. Taylor did not come forward to report the explicit comments allegedly made by Mr. Pickens's until her second interview with Ms. Ellingsen on November 18, 2009. Again, Ms. Taylor did not identify Mr. Pickens by name or provide enough details about the incident for Ms. Ellingsen to identify the alleged perpetrator.

c.    **Mr. Cordesman's Alleged Comment**

Ms. Taylor contends that Republic Manager, Keith Cordesman, called her a "fucking bitch" in February 2011 during a bean-bag toss game at a General Managers' conference in Phoenix, Arizona. She claims that she overheard the comment when Mr. Cordesman was talking with a group of people not involved in the game approximately 20 –25 feet away from her across the field. Ms. Taylor reported this incident to her supervisor Chris Rains and his boss, Heath Eddleblute. She later reported this incident to Ms. Ellingsen on August 12, 2011.

d.    **Mr. Callaway's Visit to Ms. Taylor's Home**

Ms. Taylor testified that Jason Callaway, then-Vice President of Human Resources for Allied, showed up, uninvited, to her home late at night in May or June 2008 following a work-related dinner. Mr. Callaway asked Ms. Taylor for a tour of her home. While giving Mr. Callaway a tour, they exchanged small talk and she made them both drinks. When Mr. Callaway asked to see the second level of her home, Ms. Taylor told him "no" and asked him to leave. In her deposition, Ms. Taylor conceded that she could have asked him to leave at any time, and acknowledged that Mr. Callaway did not make any appropriate comments or touch her in any way.

Ms. Taylor did not immediately report Mr. Callaway's unannounced visit and sexual proposition. There is conflicting testimony on whether she reported this incident to Area President Heath Eddleblute some six to eight weeks later. Nevertheless, Ms. Taylor concedes that she did not raise this issue with anyone for more than one year after the incident. When word of this incident traveled to Catherine Ellingsen, then-Deputy General Counsel and Vice President of Human Resources, she promptly set up in-person interviews with Ms. Boyce, Mr. Murphy, Ms. Leonard, Mr. Hill, Ms. Taylor and accused harasser, Mr. Callaway. Ms. Taylor

was interviewed by Ms. Ellingsen on November 9, 2009, and she initially denied that Mr. Callaway had even come to her home. It was not until a subsequent interview on November 18, 2009, that Ms. Taylor acknowledged that Mr. Callaway had, in fact, come to her home in 2008 and propositioned her for sex. Ms. Taylor testified about her judgment to limit her contact with Mr. Callaway following the incident. She nevertheless had to maintain a professional relationship with Mr. Callaway and participated in various Company functions where Mr. Callaway was in attendance without incident.

### e.  Mr. Callaway's Alleged Proposition to Have Sex

In June 2009, Mr. Murphy was very displeased with Ms. Taylor's performance. He met with her and presented a performance improvement plan. Mr. Murphy explained that he had concerns about Ms. Taylor's attendance at work, her ability to meet deadlines, the accuracy of her work and communications regarding her whereabouts. Mr. Callaway, who was now the Vice President of Human Resources for the East Region, and Mr. Murphy called Ms. Taylor into an office to discuss the performance improvement plan. Ms. Taylor considered the allegations and asked for an opportunity to respond to the performance improvement plan. Mr. Callaway agreed to allow Ms. Taylor time to refute the claims. Ms. Taylor met with Mr. Callaway and presented information, memoranda and data showing where she traveled, customers with whom she met, and how these out-of-town meetings furthered Company business. Mr. Callaway spoke to Mr. Murphy about Ms. Taylor's response to the performance improvement plan and supporting documentation. After that discussion, Mr. Murphy and Mr. Callaway determined that the performance improvement plan was unjustified and would be withdrawn.

Mr. Callaway later met with Ms. Taylor on a Friday afternoon to discuss the performance improvement plan. He told her that the issues she had with Mr. Murphy were a result of

miscommunication, and that the performance improvement plan would be withdrawn. Ms. Taylor testified that after Mr. Callaway delivered the news that the performance improvement plan would be withdrawn he propositioned her and asked her to have sex with him in an empty office. Ms. Taylor inferred that Mr. Callaway was seeking a sexual reward in exchange for having the performance improvement plan withdrawn. Ms. Taylor testified that, throughout her employment at Republic, Mr. Callaway continued his unwelcome advances toward her. Nonetheless, Ms. Taylor conducted herself in a professional manner with Mr. Callaway. She met with Mr. Callaway to complain about Mr. Murphy's treatment of her on various occasions April, May and June 2009.

Aggregating the claims and the evidence as outlined above, the Court finds that Ms. Taylor has carried her burden of proof that some, but not all, of the events actually occurred. The Court finds that Ms. Taylor did not meet her burden of proof by a preponderance of evidence that Mr. Van Weelden sexually propositioned her at the Managers' Conference in 2008 or that Mr. Pickens made sexually explicit comments to her during a two-and-a-half hour dinner at the 2010 Ryder Cup. With respect to Ms. Taylor's interaction with Mr. Van Weelden at the Managers' Conference in 2008, Ms. Taylor did not report the incident to management or otherwise mention the incident for over one year after the incident occurred. When Ms. Taylor did raise this issue, she refused to identify Mr. Van Weelden by name or provide sufficient details that would enable Ms. Ellingsen or anyone in management to investigate the matter.

Ms. Taylor's alleged interaction with Mr. Pickens at the 2010 Ryder Cup is also curious. Ms. Taylor testified that she, Mr. Pickens, Mr. Stradtman and approximately seven other guests sat around a dinner table as Mr. Pickens proceeded to torment her for two and a half hours with sexually explicit comments that, she states, were extremely insulting and embarrassing.

However, Ms. Taylor testified that she never asked Mr. Pickens to refrain from making the comments, nor did try to change the topic of conversation.   Additionally, Ms. Taylor acknowledged that she did not excuse herself from the table or request to change seats. Ms. Taylor's boyfriend, Mr. Stradtman, was seated a few feet away from her and testified that he did not witness Ms. Taylor expressing any discomfort during the dinner which would have alerted him that she was engaged in an unsavory conversation. Oddly, Ms. Taylor did not tell her boyfriend about these comments for months after the incident.

The Court finds, however, that Ms. Taylor has established by a preponderance of evidence that the three incidents involving Mr. Callaway and Mr. Cordesman actually occurred. While these acts of harassment are by no means ideal workplace conduct, they are not "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citation and quotation marks omitted). Title VII, the Supreme Court has explained, is not intended to be a "general civility code" in the workplace; rather, "it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 80 –81. These instances of sexual harassment, comprised of three discrete acts over a three-year period, do not reach the level of "severe" or "pervasive" conduct that is required by the Supreme Court to state a claim for hostile-work-environment discrimination. The Fourth Circuit has recognized that plaintiffs "must clear a high bar in order to satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). Our courts have found that situations involving more egregious conduct, did not meet the standard of severe and pervasive conduct as articulated by the Supreme Court. *See, e.g., Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 –4 (4th Cir. 1996) (positioning magnifying glass over crotch and giving kiss during wedding reception line "tasteless and

inappropriately forward" but not sufficiently severe or pervasive); *Atkins v. Computer Scis. Corp.*, 264 F. Supp. 2d 404, 410 –11 (E.D. Va. 2003) (supervisor gave plaintiff full body hugs, pressed her breasts against plaintiff, revealed her thighs and demanded after hours meetings).

Additionally, Ms. Taylor has failed to demonstrate that she subjectively perceived her work environment to be hostile or abusive. Conduct that a particular plaintiff subjectively regards as unwelcome, but trivial, is not actionable by that plaintiff even if, viewed objectively, it is severe or pervasive. *Harris*, 510 U.S. at 21 –22 ("If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation"). The evidence demonstrates that Ms. Taylor did not report many of these instances for over one year, and in two of the cases did not identify the perpetrators by name or provide sufficient detail to initiate an investigation. Furthermore, the evidence reveals that these alleged incidents did not prohibit or deter Ms. Taylor from cultivating or continuing her professional working relationships with Mr. Callaway, Mr. Van Weelden or Mr. Pickens.

Based upon evidence as a whole, the Court concludes that Ms. Taylor's interactions with Mr. Callaway and Mr. Cordesman while distasteful are not sufficiently severe or pervasive to establish that the workplace at Republic was hostile within the meaning of Title VII.

### 4. Imputable to the Employer

Even if the conduct alleged rose to the actionable level of severe and pervasive so as to constitute a hostile work environment, Defendants Republic and Republic Inc. cannot be held liable for the alleged harassment because Defendants exercised reasonable care to prevent and promptly correct any allegedly sexually harassing behaviors and Ms. Taylor unreasonably failed to take advantage of any corrective or preventive opportunities that were provided.

An employer's liability under Title VII for workplace harassment depends on the status of the harasser. *Vance v. Ball State Univ.*, 133 S. Ct. 2435, 2439 (2013). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807. However, when no tangible employment action is taken, such as here, the employer may raise an affirmative defense to liability. *Faragher*, 524 U.S. at 807–08, *Burlington Indus., Inc.*, 524 U.S. at 765. The *Faragher/Ellerth* defense is raised by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any [ ] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

As the Supreme Court recently explained, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S.Ct. at 2439. The Court made clear that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he ... is empowered by the employer to take tangible employment actions against the victim." *Id.* A "tangible employment action" is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2442 (internal quotation marks omitted).

The parties dispute the supervisory status of Mr. Callaway, Mr. Van Weelden, Mr. Pickens and Mr. Cordesman. Applying the standard in *Vance* to this action, it is clear that Mr. Callaway, Vice President of Human Resources for the East Region, was Ms. Taylor's supervisor for purposes of Title VII. Evidence adduced at trial demonstrates that Mr. Callaway intervened

on Ms. Taylor's behalf and prevented a performance improvement plan from being instituted by Douglas Murphy, Ms. Taylor's supervisor in June 2009. While the parties dispute the extent of Mr. Callaway's role in the synergy bonus process, the record reveals that Mr. Callaway was directed correspondence relating to Ms. Taylor's eligibility to receive a synergy bonus, and thus suggests that Mr. Callaway had the authority to effect a significant change in Ms. Taylor's employment.

Ms. Taylor, however, has not demonstrated that the remaining Republic employees whom she alleges engaged in sexual harassment, Mr. Van Weelden, Mr. Pickens and Mr. Cordesman, were her "supervisors" within the meaning of *Vance*. Evidence adduced at trial established that Ms. Taylor's supervisors were Mr. Murphy, Mr. Rains, Mr. Jamison and Mr. Krall. Ms. Taylor did not introduce evidence at trial establishing that Mr. Van Weelden, Mr. Pickens or Mr. Cordesman, her alleged harassers, directed her day-to-day activities or had the authority to significantly change her employment status. Therefore, Mr. Callaway, Mr. Van Weelden, Mr. Pickens and Mr. Cordesman are properly characterized as her co-workers for purposes of Title VII.

Under either theory of liability, Republic and Republic, Inc. are not liable for the actions of Mr. Callaway, Mr. Van Weelden, Mr. Pickens and Mr. Cordesman. The record demonstrates that Republic and Republic, Inc. exercised reasonable care to prevent and promptly correct any allegedly sexually harassing behaviors and that Ms. Taylor unreasonably failed to take advantage of any corrective or preventive opportunities that were provided. *See Burlington Indus., Inc.*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. As a director in the Company, Ms. Taylor was acutely aware of Republic's anti-harassment policy and acknowledged that she attended several training sessions pertaining to the policy. Ms. Taylor also conceded that, as a director, she had

the duty to report any incidents of harassment to a Site or Area Manager, the Regional Human Resources Manager, a Corporate Human Resources Manager, or the AWARE line. Ms. Taylor made the decision not to follow the Company's anti-harassment policies and procedures. Defendants only learned of Mr. Callaway's conduct indirectly, when Ms. Taylor informed Ms. Boyce about his 2008 visit to her home at a non-work-related dinner. Once Ms. Boyce invoked the process, Defendants promptly instituted an investigation and interviewed Ms. Taylor, Mr. Callaway, Ms. Boyce and others to determine what actually had occurred when Mr. Callaway made an unannounced visit to Ms. Taylor's home in 2008. In a subsequent interview with Ms. Taylor, Ms. Ellingsen was told of several incidents where Ms. Taylor's male colleagues made unwanted sexual advances toward her. Ms. Ellingsen prompted Ms. Taylor to give her detailed information about the alleged acts of sexual harassment so that she could initiate an investigation of the alleged incidents, but Ms. Taylor refused to identify the alleged harassers by name or title, and therefore hindered any potential investigation of alleged sexual harassment. Following Ms. Ellingsen's investigation of Mr. Callaway's conduct, Defendants took immediate corrective action. Defendants reprimanded Mr. Callaway, restricted his control over Ms. Taylor's personnel matters, and directed that Ms. Ellingsen would personally handle Ms. Taylor's personnel matters. Ms. Ellingsen told Ms. Taylor that if she had any workplace concerns or suspected retaliation, she should contact Ms. Ellingsen immediately. Ms. Taylor, however, did not contact Ms. Ellingsen between November 2009 and August 2011 to report any of the alleged incidents.

For these reasons, the Court holds that Ms. Taylor has not established by a preponderance of the evidence that the workplace conduct she complains of was sufficiently severe or pervasive to establish a hostile work environment claim so as to impute liability to Defendants Republic

and Republic Inc.[3]  Accordingly, the Court finds for Defendants Republic and Republic Inc. on

Ms. Taylor's claim for hostile work environment.

**B.     RETALIATION**

The second issue before the Court is whether Defendants unlawfully retaliated against

Ms. Taylor because she engaged in protected activity.  At trial, Ms. Taylor testified that she was

denied a synergy bonus and received lesser stock options than her male counterparts in

retaliation for her sexual harassment allegations against Mr. Callaway.

In its Memorandum Opinion and Order dated February 6, 2013, the Court dismissed Ms.

Taylor's retaliation claim based upon the denial of the synergy bonus.  This claim, therefore, is

moot.

Ms. Taylor presented no evidence at trial to support her claim that her male counterparts

in other regions received greater stock options than her.  Thus, the Court finds that Ms. Taylor

did not meet her burden of proof by a preponderance of evidence on this claim.

**C.     RETALIATORY DISCHARGE**

The remaining issue before the Court is whether Ms. Taylor's employment was

terminated as a result of her engaging in protected activity in violation of Title VII of the Civil

Rights Act of 1964.  The Court holds that Defendant Republic, Inc. retaliated against Ms. Taylor

in violation of Title VII of the Civil Rights Act of 1964 when Ms. Ellingsen terminated Ms.

Taylor's employment forty-two (42) days after she complained of potential retaliatory,

discriminatory and hostile actions.

---

[3] The Court notes that Title VII does not provide a cause of action against Defendants Jason
Callaway, Ronald Krall, Douglas Murphy, Christopher Rains and Daniel Jameson in their
individual capacities. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999) (finding
that Title VII does not provide for actions against individual defendants for violations of its
provisions).

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge ... or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Under the burden-shifting scheme set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04 (1973), plaintiff must first establish a prima facie case of retaliation. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 248 (4th Cir. 2000). To meet this initial burden, the plaintiff must prove three separate elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir. 2004). If the employer can do so, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a mere pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). While the burden of production shifts throughout, the burden of persuasion remains with the plaintiff. *Id.* at 144.

To satisfy the first element, the employee must show that she participated in an investigation or proceeding under Title VII, by filing a charge with the EEOC, for example, or that she opposed discriminatory practices in the workplace, such as by "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

In the context of a retaliation claim, a "protected activity" may fall into two categories: opposition and participation. *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259. "[O]pposition activity is protected when it responds to an employment practice that the employee *reasonably believes* is unlawful." *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006); *see also Okoli v. City of Baltimore*, 648 F.3d 216, 223 –24 (4th Cir. 2011) (complaining to supervisors about harassment qualifies as protected activity, even where the complaint "did not explicitly mention sexual harassment" and did not "detail the sexual incidents [the employee] later relayed"). The plaintiff need not establish that the employment practice she opposed was in violation of Title VII. Rather, she must have held a reasonable, good-faith belief that the employment practice she opposed was in violation of Title VII. *Jordan*, 458 F.3d at 340.

On August 12, 2011, Ms. Taylor contacted Ms. Ellingsen, Vice President of Human Resources for Defendant Republic Inc., by email stating that she suspected retaliation based on her earlier sexual harassment complaints involving Mr. Callaway. In the conversations that followed the email, Ms. Taylor told Ms. Ellingsen that she felt as though she was treated differently than her male counterparts in other regions. She complained that Mr. Rains did not appropriately value her performance, that Mr. Krall micromanaged her and that she was treated differently from her regional counterparts in terms of her ability to travel for her job. Ms. Taylor stated that she believed that Mr. Callaway placed a target on her back and was damaging her standing in the Company.

Even if the conduct which Ms. Taylor complained of was not in violation of Title VII, the evidence nonetheless suggests that Ms. Taylor, in reasonable good faith, was protesting the conduct based upon what she felt resulted from her speaking out about Mr. Callaway's 2008 visit to her home. This belief, under the circumstances, was objectively reasonable. Accordingly, the Court finds that Ms. Taylor's August 12, 2011 email to Ms. Ellingsen constitutes protected activity.

The second element of a retaliation claim is satisfied by showing that a retaliatory act had an adverse effect on the terms, conditions, or benefits of employment. *Von Gunten v. Maryland*, 243 F.3d. 858, 866 (4th Cir. 2001). Defendants Republic and Republic Inc. vehemently deny that Ms. Taylor was terminated. Rather, Defendants argue that Ms. Taylor voluntarily agreed to leave Republic, and Republic's refusal to allow her to rescind that agreement was a result of performance and trust issues. Despite these contentions, the evidence adduced at trial clearly demonstrates that Ms. Taylor was, in fact, terminated on September 23, 2011. The Fourth Circuit recognizes termination as an adverse employment action. *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir.1997). Ms. Taylor, therefore, has established that she suffered an adverse employment action.

To satisfy the third element, a plaintiff must establish a causal link between the protected activity and her termination. The United States Supreme Court recently clarified that "Title VII retaliation claims must be proved according to the traditional principles of but-for causation," requiring "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas So. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). To establish a "but-for" causal relation, a plaintiff must establish that "the desire to retaliate was the 'but-for' cause of [her] termination." *Id.* at 2528. Ms. Taylor

can satisfy this burden if she can prove a "close temporal proximity" between the time the Company learned about her protected activity and her discharge. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (recognizing that mere temporal proximity between the employer's knowledge of protected activity and adverse action is sufficient for causation if the proximity is "very close"); *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) ("A causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against the employee shortly after learning of the protected activity."); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (ten-week period sufficient to satisfy prima facie causation requirement); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (three-month period of time found sufficient to prove causal connection in prima facie case). While evidence as to the proximity of time "far from exclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." *Cerberonics*, 871 F.2d at 457.

Here, Ms. Taylor has demonstrated a close temporal proximity between her participation in protected activity and her discharge. On August 12, 2011, Ms. Taylor sent an email to Ms. Ellingsen stating that she believed she had been the subject of discriminatory, hostile and retaliatory actions as a result of reporting Mr. Callaway's visit to her home. On August 29, 2011, Ms. Taylor's supervisor, Chris Rains, met with Ms. Taylor to discuss the deficiencies he observed in her performance. Ms. Taylor became defensive and told Mr. Rains that he was being used as a pawn by Mr. Callaway to retaliate against her. Ms. Taylor then began to explain her concerns. Mr. Rains stated that he was not aware of Ms. Taylor's complaint against Mr. Callaway, but he had been informed by Ms. Ellingsen to deal directly with her, and not Mr. Callaway regarding Ms. Taylor's personnel matters. Ms. Ellingsen had previously told Mr. Rains

that if Ms. Taylor brought up something of which he was unaware, he should send Ms. Taylor home and call Ms. Ellingsen for further instructions. When Ms. Taylor raised her issues with Mr. Callaway, Mr. Rains instructed Ms. Taylor to go home for the day and wait to hear from Ms. Ellingsen.

Despite numerous emails to Mr. Rains and Ms. Ellingsen following the August 29, 2011 meeting, Ms. Taylor was not allowed to return to work, and her work status remained uncertain. Mr. Rains did not tell Ms. Taylor whether she was suspended, terminated or on administrative leave. Ms. Taylor then spoke with Ms. Ellingsen to discuss her status and pending complaints of retaliation.

On September 6, 2011, Ms. Ellingsen sent Ms. Taylor a severance agreement for her review and Ms. Taylor's last day of employment was on September 23, 2011. Forty-two (42) days after Ms. Taylor engaged in protected activity, she was terminated from her employment. This proximity, coupled with the fact that Ms. Ellingsen never communicated with or consulted Mr. Rains, or anyone else with supervisory authority over Ms. Taylor, regarding Ms. Taylor's job performance demonstrates a sufficient causal connection necessary to establish a prima facie case for retaliation.

Since Ms. Taylor has established a prima facie case of retaliation, the burden shifts to Defendant Republic Inc. to rebut the presumption of retaliation by articulating a legitimate, nonretaliatory reason for its actions. Defendant maintains that Ms. Taylor voluntarily agreed to leave the Company, and its subsequent refusal to allow her to rescind that agreement was due to performance and trust issues. Defendant claims that Mr. Rains had longstanding concerns about Ms. Taylor's performance, so much so that he rated her performance as "not meeting expectations" six months prior to her departure. Defendant points out that Mr. Rains had spoken

to Ms. Ellingsen about Ms. Taylor's deteriorating performance in early August 2011, and proclaims that Ms. Taylor's declining job performance, coupled with her dishonesty about leaving work early on August 19, 2011 and her failure to attend a scheduled conference call the following week, led to her departure from the Company.

Defendant's arguments are less than credible. The idea that Ms. Taylor voluntarily agreed to leave the Company is wholly unsupported. Upon learning of Ms. Taylor's complaints of discrimination in August 2011, Senior Vice President of Human Resources Catherine Ellingsen, offered three options to Ms. Taylor. While it is disputed whether Ms. Taylor outright rejected the option to remain in her position, there is no dispute that Ms. Ellingsen forwarded a severance agreement to Ms. Taylor for her review on September 6, 2011. Ms. Taylor agreed to consider the severance agreement before she was made aware of the content of the agreement. Republic Inc. offered Ms. Taylor $59,728, less than one-quarter of her salary at the time of her separation. She would also be required to release all claims against the Company, sign a nondisclosure agreement and remain bound to the non-compete agreement already in place. Ms. Taylor reviewed the severance agreement, and declined to sign it on September 8, 2011. Afterwards, Ms. Taylor consulted with Ms. Ellingsen about the next steps so that she may return to work. Ms. Taylor then learned that Ms. Ellingsen had investigated Mr. Rains's complaints relating to the WasteCon conference. Ms. Ellingsen proclaimed that she told Ms. Taylor that returning to the Company was no longer an option and that Ms. Taylor was terminated. Ms. Taylor testified that she did not have a comparable job lined up, and she needed her job at Republic to support herself and her family. Based upon this evidence, the Court finds that Ms. Taylor was, in fact, terminated from employment by Ms. Ellingsen on September 23, 2011, her last day of employment.

Defendant's argument that Ms. Taylor was a marginal performer who was on the brink of termination also fails. Evidence adduced at trial suggests that Ms. Taylor's job performance and dishonesty, standing alone, would not have led to her termination. As evidenced by various emails between Ms. Taylor and Mr. Rains, her job performance peaked and flowed throughout the time he supervised her. However, it was not until approximately August 18, 2011 that Mr. Rains began discussions with Ms. Ellingsen about whether to place Ms. Taylor on a performance improvement plan. In fact, it was Mr. Rains's intention at the August 29, 2011 meeting with Ms. Taylor to determine whether her performance could be turned around or whether she should, in fact, be placed on a performance improvement plan. Mr. Rains, however, never had the opportunity to determine whether a performance improvement plan was necessary.

The Court finds it remarkable that Ms. Ellingsen, Senior Vice President of Human Resources, was the sole decision-maker on whether Ms. Taylor would continue her career at Republic. Upon learning of Ms. Taylor's complaints, Ms. Ellingsen assisted Mr. Rains in creating a performance improvement plan based upon his perceptions of Ms. Taylor's job performance. Ms. Ellingsen did not conduct an independent evaluation to determine whether Mr. Rains's concerns were substantiated. Had she done so, Ms. Ellingsen would have discovered that despite Mr. Rains's critical reviews, Ms. Taylor was a strong performer with a track record of success. Ms. Taylor's role as Director of Municipal Sales for the East Region involved sales revenue expansion and annual customer retention goals. The undisputed record demonstrates that Ms. Taylor had met and exceeded the Company's 2011 annual goals by August 2011 and was on track to receive bonuses.

Ms. Ellingsen did not fully perform her role as Vice President of Human Resources. She did not investigate Ms. Taylor's complaints that she was subject to retaliation and discrimination

as a result of her sexual harassment allegations. She did not conduct an investigation to determine whether Mr. Callaway was still involved in Ms. Taylor's employment matters despite Ms. Taylor's contention that Mr. Callaway was copied on correspondence from her supervisors relating to her personnel matters. She did not initiate a meeting between Mr. Rains and Ms. Taylor or otherwise afford the opportunity for Mr. Rains to discuss with Ms. Taylor his perceptions of her work performance.[4] Instead, Ms. Ellingsen looked into whether Ms. Taylor left work early on Friday, August 19, 2011 to attend the WasteCon conference without permission and whether she had missed a scheduled conference call on Tuesday, August 23, 2011. While these are serious matters, Mr. Rains did not tell Ms. Ellingsen that he believed that Ms. Taylor should be fired for this misconduct. Interestingly, Ms. Ellingsen never discussed with Mr. Rains what actions she intended to take against Ms. Taylor or discussed her termination.

Neither Ms. Ellingsen nor Mr. Rains could point to any policy, directive or instance where a director-level employee who left work a few hours early to attend an out-of-town work conference and missed a conference call was subject to immediate termination. To be clear, Mr. Rains and Ms. Ellingsen had every right to terminate Ms. Taylor without cause. The Court, however, is left with the firm conviction that Ms. Ellingsen did not investigate Ms. Taylor's complaints and summarily terminated her because of her complaints of discrimination, harassment and retaliation. In essence, the Court finds that Ms. Taylor would still be gainfully employed at Republic had she not sent an email to Ms. Ellingsen on August 12, 2011 expressing

---

[4] The Court notes that in June 2009 when Ms. Taylor's then-supervisor, Mr. Murphy, was contemplating placing Ms. Taylor on a performance improvement plan he and Mr. Callaway met with Ms. Taylor to discuss her performance. Ms. Taylor was then afforded the opportunity to respond to the allegations, and it turned out that Mr. Murphy's concerns about her performance were inaccurate and resulted from miscommunication. Consequently, the performance improvement plan was withdrawn.

her suspicions of discrimination, harassment and retaliation.   Accordingly, the Court finds in favor of Plaintiff Jennifer Taylor and against Defendant Republic, Inc. on her claim for retaliatory discharge.[5]

## D.   **DAMAGES**

Only Ms. Taylor's claim for retaliatory discharge was successfully proven at trial; thus, damages need only be considered as to that claim.  In her Amended Complaint, Ms. Taylor seeks back pay, front pay, compensatory damages, punitive damages, injunctive relief and attorneys' fees and costs.

### 1.   **Back Pay**

Title VII provides prevailing employees the amount of lost wages, or "back pay," that would have accrued from the time of the wrongful discharge through "the time when the court *might* reinstate the employee." *Coles v. Deltaville Boatyard, LLC*, No. 3:10cv491, 2011 WL 4804871, at *8 (Oct. 11, 2011 4th Cir. 2011).  "[W]hen choosing whether to award back pay, the 'District Court's decision must . . . be measured against the purposes which inform Title VII.'" *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985) (quoting *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)).  There are dual purposes behind Title VII, first, "the elimination of employment discrimination" and second, "the restoration of persons aggrieved to the situation they would have occupied were it not for the unlawful discrimination." *Id.* Back pay is "designed to fulfill the 'make whole' purposes of the act[], and concluded that in Title VII cases 'back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.'" *Id.* (quoting *Albermarle Paper Co.*, 422 U.S. at 421).

---

[5] Footnote 4, *supra.*

The amount of back pay awarded to a successful Title VII plaintiff is limited "by the statutory duty to mitigate employer damages." *Id.* Section 2000e-5(g) declares that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g). Thus, the amount of back pay awarded should be reduced accordingly. Furthermore, in the case of a plaintiff who was unlawfully discharged, like the plaintiff here, the claimant's duty to mitigate damages requires reasonable diligent efforts to seek and accept "new employment substantially equivalent to that from which he was discharged." *Brady*, 753 F.2d at 1273 (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982)).

The Court finds that Ms. Taylor is entitled to be made whole due to Republic Inc.'s unlawful retaliatory discharge. The evidence at trial demonstrates that Ms. Taylor made reasonable efforts to mitigate her damages. Due to Ms. Taylor's non-compete agreement, she was precluded from applying for positions in the field in which she had gained a great deal of experience. Ms. Taylor testified that applied for more than one-hundred (100) positions, but she only received one job offer. She began employment with Vector Disease Control as a sales representative on July 9, 2012.

The Court adopts the calculations of Ms. Taylor's expert witness, Mr. William Foote, that Ms. Taylor would have earned $377,734 had she remained employed with Republic until the date of trial, May 6, 2013. In evaluating Ms. Taylor's back pay damages, Mr. Foote considered employment documentation provided to him by Defendants, including documentation regarding Ms. Taylor's tax returns, earnings histories, stock option awards and fringe benefits, i.e., medical and dental coverage, health insurance, disability, and a retirement plan match.   Mr. Foote

evaluated Ms. Taylor's current salary in comparison with her salary at Republic at the date of her termination.

Mr. Foote calculated back pay damages from September 24, 2011 to May 6, 2013, the date after Ms. Taylor's last day of employment until the date of trial. Mr. Foote concluded that Ms. Taylor's lost earnings for this time period equaled $377,734. He arrived at this dollar amount by calculating lost earnings from three time periods, then subtracting the replacement earnings Ms. Taylor has earned from her compensation at Vector Disease Control.

| Time Period | Lost Earnings | Replacement Earnings | Net Lost Earnings |
|---|---|---|---|
| 9/24/2011 to 12/31/2011 | $49,541 | --- | $49,541 |
| 1/1/2012 to 12/31/2012 | $272,248 | $46,347 | $225,901 |
| 1/1/2013 to 5/6/2013 | $133,925 | $31,633 | $102,292 |
| **Total Back Pay** | | | **$377,734** |

Combining the calculations for the total net lost earnings for each period, the Court finds that Ms. Taylor is entitled to an award of back pay earnings of $377,734, which represents the period from her last date of employment with Republic through the first day of trial.

### 2. Front Pay

"The equitable remedy of front pay is generally available when an employer has terminated an employee unlawfully and the employee's reinstatement is not possible." *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 238 (4th Cir. 2007) (unpublished per curiam decision) (citation omitted). Front pay is designed to place a plaintiff in the financial position she would have been in had she been reinstated, but such an award should "be granted sparingly" because it

could "result in an unfair windfall," *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 392 (D. Md. 1997) (citation omitted). "[T]he Court may exercise its discretion to award 'front pay,' which includes those future earnings lost as a result of the statutory violation." *Coles*, 2011 WL 4804871, at *8 (citation omitted). Although "[t]he Fourth Circuit has not specifically enumerated a list of factors to consider in deciding to award front pay[,][o]ther courts have considered the plaintiff's prospect of obtaining comparable employment; the time period of the award; whether the plaintiff intended to work; and whether liquidated damages have been awarded." *Ford*, 984 F. Supp. at 392 (citing *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994)). "Because front pay necessarily involves speculation as to future events, the Court must judiciously scrutinize the record to determine whether future events are sufficiently predictable to justify such an award." *Id.*

While reinstatement of employment with the defendant employer is the preferred remedy in employment discrimination cases, the Court finds that reinstatement of Ms. Taylor to a position with Republic is impracticable given the nature of this litigation. The Supreme Court has explained that "reinstatement is not viable" if there is "continuing hostility between the plaintiff and the employer or its workers" or if the plaintiff has suffered "psychological injuries ... as a result of the discrimination." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (citations omitted). Similarly, the Court has recognized that front pay can be "appropriate given substantial animosity between parties where 'the parties' relationship was not likely to improve, and the nature of the business required a high degree of mutual trust and confidence.' " *Id.* at 850 (quoting *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1066 (8th Cir. 1988)). Here, there can be no question that the events underlying Ms. Taylor's claims of hostile work environment and retaliation have resulted in a substantial degree of hostility

between the parties. Thus, the Court finds that reinstatement is not an appropriate remedy in this case. The Court will therefore award front pay damages to Ms. Taylor.

At the time of her termination from Republic, Ms. Taylor was forty-two (42) years-old and had been employed with the Company for four years. The position of Regional Director of Municipal Services for Republic afforded Ms. Taylor a base salary of $170,000. Her total compensation, including health insurance, disability benefits, bonuses, stock options and 401(k) employer match benefits ranged between $214,640 and $263,148 during her tenure. While Ms. Taylor did not present evidence related to the length of employment of her counterparts in other regions, she testified that she anticipated working for Republic for an additional ten years had she not been fired from Republic. As noted above, Ms. Taylor actively sought employment for ten months following her termination.

Ms. Taylor is seeking front pay damages in the amount of $1,282,105, which represents future earnings for eight years of employment. Mr. Foote arrived at this figure by determining that Ms. Taylor's base lost earnings while employed at Republic in 2011 amounted to $272,248. He calculated Ms. Taylor's base replacement earnings as follows: Ms. Taylor's position with Vector Disease Control provides a base salary of $80,000 with health insurance coverage and disability benefits in the amount of $9,400 annually, resulting in a total of $89,400. Mr. Foote testified that the base replacement earnings would be subject to a 2.5% growth rate based upon a long-term inflation estimate. The chart below reflects Mr. Foote's calculations based upon a front pay damage award for eight years of employment:

| Time Period | Lost Earnings | Replacement Earnings | Net Lost Earnings | Period (n) | Present Value Factor | Present Value |
|---|---|---|---|---|---|---|
| 5/7/2013 to 12/31/2013 | $138,323 | $60,002 | $78,321 | 0.33 | 0.9925 | $77,815 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/1/2014 to 12/31/2014 | $272,248 | $93,926 | $178,322 | 1.15 | 0.9774 | $174,290 |
| 1/1/2015 to 12/31/2015 | $272,248 | $96,274 | $175,974 | 2.15 | 0.9582 | $168,623 |
| 1/1/2016 to 12/31/2016 | $272,248 | $98,681 | $173,567 | 3.15 | 0.9394 | $163,055 |
| 1/1/2017 to 12/31/2017 | $272,248 | $101,148 | $171,100 | 4.15 | 0.921 | $157,586 |
| 1/1/2018 to 12/31/2018 | $272,248 | $103,677 | $168,571 | 5.15 | 0.903 | $152,213 |
| 1/1/2019 to 12/31/2019 | $272,248 | $106,269 | $165,979 | 6.15 | 0.8853 | $146,934 |
| 1/1/2020 to 12/31/2020 | $272,248 | $108,926 | $163,322 | 7.15 | 0.8679 | $141,746 |
| 1/1/2021 to 12/31/2021 | $198,405 | $81,366 | $117,039 | 8.02 | 0.8531 | $99,843 |
| **Total Front Pay** | | | **$1,392,195** | | | **$1,282,105** |

The Court finds that said calculations are fully supported by the record, and therefore adopts the future lost wages calculations made by Mr. Foote. The Court, however, finds that a front pay damage award of five years is appropriate. The Fourth Circuit has cautioned courts to award front pay damages sparingly as it can result in an unfair windfall for the plaintiff. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). Although Ms. Taylor was a strong performer who had achieved and exceeded her sales and retention goals at the time of her termination, it is unlikely that she would have remained at Republic for an additional ten years given her complaints about the management styles of her supervisors and allegations regarding

disparate travel restrictions. For these reasons, the Court awards Ms. Taylor $804,791 in front pay damages which represents lost wage earnings from May 7, 2013 to May 7, 2018.

### 3.   Compensatory Damages

Section 1981a(b)(3) provides compensatory damage awards "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. § 1981a(b)(3). Because back pay, which is a "make whole remedy," is provided by the statutory remedies in Title VII, such damages "were explicitly omitted from those compensatory damages available pursuant to 42 U.S.C. § 1981a" as to avoid providing a plaintiff "double recovery." *Coles*, 2011 WL 4804871, at *8.

As an initial matter, compensatory damages awarded under § 1981a are capped depending on the number of employees continuously employed at the company at issue. 42 U.S.C. § 1981a(b)(3). In her Amended Complaint, Ms. Taylor broadly alleges that Defendants Republic Inc. and Republic are one entity and continuously employed five-hundred (500) or more employees "for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." The record demonstrates, however, that Republic Inc. and Republic are two distinct companies that operate as parent company and subsidiary, respectively. It is unclear how many employees were employed by Defendant Republic Inc. during the relevant time period because Ms. Taylor did not present any evidence to support her allegation. Consequently, the Court finds the appropriate statutory limitation to be more than fourteen (14) and fewer than one-hundred-and-one (101) employees. See 42 U.S.C. § 1981a(b)(3)(A) ("[I]n the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year," compensatory damages may not exceed $50,000).

The Fourth Circuit has instructed that "an award of substantial compensatory damages ... must be proportional to the actual injury incurred.... The award must focus on the real injury sustained." *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1082 (4th Cir. 1987). A plaintiff's testimony alone can support an award of compensatory damages for emotional distress. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)). Where a plaintiff's testimony is offered to support damages for emotional distress, such testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* at 546–47 (quoting *Price*, 93 F.3d at 1254). The testimony cannot rely on "conclusory statements that the plaintiff suffered emotional distress" or the mere facts that a constitutional violation occurred or that the plaintiff was wronged. *Id.* at 547 (quoting *Price*, 93 F.3d at 1254). Rather, it must indicate with specificity "how [the plaintiffs] alleged distress manifested itself." *Id.* (quoting *Price*, 93 F.3d at 1254).

Some factors the courts consider in determining whether substantial evidence supports an award of compensatory damages for emotional distress include: (1) the loss of esteem from peers; (2) physical injury resulting from emotional distress; (3) psychological counseling or treatment; (4) loss of income or other pecuniary expense; (5) the degree of emotional distress; (6) the context of the events surrounding it; (7) evidence tending to corroborate the plaintiff's testimony; (8) the connection between the conduct at issue and the distress; (9) medical treatment rendered due to the distress; and (10) mitigating factors. *Price*, 93 F.3d at 1254.

Ms. Taylor testified that she was stunned and devastated by finding herself suddenly unemployed and without income. She stated that she was initially reluctant to complain about retaliation because she expected her complaints would hinder her promotional opportunities and

may place her job in jeopardy. Ms. Taylor was blindsided when Mr. Rains sent her home on August 29, 2011 without giving her the opportunity to respond to his concerns. She anxiously awaited further instruction from Ms. Ellingsen about next steps. Ms. Taylor's anxiety turned into dread as Mr. Rains told her not to return to the office. She was not given any reason by Ms. Ellingsen or Mr. Rains as to why she was prohibited from returning to work. Ms. Taylor was depressed and feared losing the best job she had ever had. All of a sudden, Ms. Taylor faced the reality that she was forced out of her position at Republic and the waste management industry as a result of the non-compete agreement she signed when Allied and Republic merged.

Ms. Taylor began a long and challenging search for a new job. She testified that she worried about the ability to pay her bills, provide for herself and her mother. She stated that she suffered the same uncertainty that she experienced as a homeless teen and lived her adult life determined to be self-sufficient. When she was fired by Republic Inc., Ms. Taylor lost her lifeline and she became riddled with depression, anxiety and sadness. The job offer that she eventually received was a considerable step-back for her. The job was an entry-level position in a different industry, different state, and offered less than one-quarter of the salary she earned at Republic.

The severity of Ms. Taylor's emotional distress was exemplified by Psychiatrist Ryan Shugarman's testimony that Ms. Taylor's emotional distress manifested into major depressive disorder, adjustment disorder with anxiety and the exacerbation of a preexisting eating disorder. Defendants presented no evidence, or contradicting expert testimony that would undermine Dr. Shugarman's diagnosis. Quantifying mental anguish, emotional distress and anxiety is not a simple mathematical calculation for the Court. Here, the Court holds that Ms. Taylor has shown demonstrable emotional distress which is evidenced by her testimony about the impact of losing

her job, the apparent economic loss and the emotional distress she suffered as a result of her retaliatory discharge. The Court finds that Ms. Taylor would not have suffered this immediate economic loss and emotional distress but for Republic Inc.'s conduct. Taking into account Ms. Taylor's emotional distress for the sudden loss of her job, the Court awards Ms. Taylor $50,000 in compensatory damages, the maximum amount of damages allowed under the statutory cap.

### 4.   Punitive Damages

Title VII provides for punitive damages only in cases where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see Kolstad v. Am. Dental Ass'n.*, 527 U.S. 526, 535 (1999).

Ms. Taylor argues that she is entitled to punitive damages because her rights were completely disregarded by Defendants Republic and Republic Inc. while she was employed, which is evidenced by the fact that she was terminated without an investigation. Ms. Taylor also proffered evidence which she believes demonstrates that Republic retaliated against her by canceling its contracts with one of its preferred vendors, Otto. Ms. Taylor's husband, Steve Stradtman, is the former chief executive officer of Otto. The Court, however, declines, to take the submission into consideration as the Court previously dismissed Ms. Taylor's claim for associational retaliation based upon the same facts.

The Court declines to award punitive damages in this case. There has been no showing that Ms. Ellingsen behaved with the requisite malice or reckless indifference necessary for an award of punitive damages. While it is evident that Ms. Ellingsen, an experienced attorney and human resources professional, should have known better than to proceed as she has here, the

Court finds no malicious intent or behavior which would warrant the consideration of punitive damages.

### 6.   Attorneys' Fees and Costs

The Court finds that Ms. Taylor, as the prevailing party on her claim for retaliatory discharge, is entitled to attorneys' fees and costs. 42 U.S.C. § 2000e-5(k).   In determining the amount of the award of attorneys' fees and costs, the primary consideration must be given to the amount of damages awarded as compared to the amount sought. *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996) (citation and internal quotation marks omitted). An attorney should recover the full compensatory fee for achieving excellent results; however, "[a] reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435, 439–40, (1983)).  Applying these principles and those set forth in *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235 (4th Cir. 2009), within fourteen (14) days of this Order, Ms. Taylor is ordered to submit proper documentation in support of the fees and costs that she seeks for prevailing on her claim for retaliatory discharge. *See* Fed. R. Civ. P. 54(d) (allowing Court order to modify deadline for fee and cost submissions); *Gaskins v. BFI Waste Servs., LLC*, 281 F. App'x 255, 258–60 (4th Cir. 2008).

### 7.   Injunctive Relief

The Court denies Ms. Taylor's request for injunctive relief.

### CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants Republic Services, Inc. and Republic Services of Virginia, LLC and against Plaintiff Jennifer Taylor on Count I, and in

favor of Plaintiff Jennifer Taylor and against Defendant Republic Services, Inc. on Count II of the Amended Complaint.

Accordingly, **IT IS HEREBY ORDERED THAT**:

(1) Judgment is entered in favor of Defendants Republic Services, Inc. and Republic Services of Virginia, LLC and against Plaintiff Jennifer Taylor on the claim of hostile work environment as stated in Count I of the Amended Complaint;

(2) Judgment is entered in favor of Plaintiff Jennifer Taylor and against Defendant Republic Services, Inc. on the claim of retaliatory discharge as stated in Count II of the Amended Complaint;

(3) Plaintiff Jennifer Taylor is awarded damages against Defendant Republic Services, Inc. on Count II of the Amended Complaint in the amounts set forth below:

(a)   Back pay damages in the amount of $377,734 pursuant to Title VII of the Civil Rights Act of 1964;

(b)   Front pay damages in the amount of $804,791 pursuant to Title VII of the Civil Rights Act of 1964;

(c)   Compensatory damages in the amount of $50,000 pursuant to 42 U.S.C. § 1981a(b)(3); and

(d)   Reasonable attorneys' fees and costs in an amount to be determined in a subsequent order;

(4) Plaintiff Jennifer Taylor's claim for retaliation based upon denial of a synergy bonus is **DENIED** as moot;

(5) Plaintiff Jennifer Taylor's claim for retaliation based upon her allegation that she received lesser stock options than her male counterparts is **DISMISSED**;

(6) All remaining claims against Defendants Jason Callaway, Ronald Krall, Douglas Murphy, Christopher Rains and Daniel E. Jameson in their individual capacity are **DISMISSED**; and

(7) Plaintiff Jennifer Taylor shall submit within fourteen (14) days of this Order proper documentation in support of her request for costs and fees. *See Robinson v. Equifax Svcs., LLC,* 560 F.3d 235 (4th Cir. 2009).

A separate Rule 58 Judgment Order will issue with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

ENTERED this 16th day of September 2013.

Alexandria, Virginia
9 / 16 / 2013

                                    /s/
                            _____
                            Gerald Bruce Lee
                            United States District Judge